# United States Court of Appeals for the First Circuit

———————————————

CORPORACION DEL CENTRO CARDIOVASCULAR DE PUERTO RICO Y EL CARIBE,

Plaintiff – Appellant,

v.

MEDSPHERE SYSTEMS CORPORATION; CANTATA HEALTH, LLC;

Defendants – Appellees.

RICHARD ROE; INSURER X,

Defendants.

———————————————

On Appeal from the United States District Court for the District of Puerto Rico
Civil Case No. 22-cv-1425-CVR

———————————————

## APPELLANT'S BRIEF

———————————————

ELIEZER A. ALDARONDO-LÓPEZ
BAR NO. 124875
*Counsel of Record*
ALDARONDO & LÓPEZ-BRAS, LLC
ALB Plaza, Suite 400
16 Las Cumbres Ave.
Guaynabo, PR 00969
Tel.: (787) 474-5447
Email: eliezer.aldarondo@alblegal.net

December 12, 2023

*Counsel for Plaintiff-Appellant*

## DISCLOSURE STATEMENT

As discussed in this brief, Plaintiff-Appellant, Corporacion del Centro Cardiovascular de Puerto Rico, is a Puerto Rico governmental corporation created by statute. *See* P.R. Laws Ann. tit. 24 §§343, et seq.[*]

Respectfully submitted,

/s/ Eliezer A. Aldarondo

ELIEZER A. ALDARONDO

December 12, 2023.

---

[*] It appears that, under Rule 26.1, governmental corporations are not required to file a Disclosure Statement. Nonetheless, Appellant files this statement in response to the First Circuit *Order* entered on December 11, requiring Appellant to file a disclosure statement.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT..................................................... 1

STATEMENT OF THE ISSUE...................................................... 1

STATEMENT OF THE CASE....................................................... 2

SUMMARY OF THE ARGUMENT................................................ 11

STANDARD OF REVIEW......................................................... 13

ARGUMENT.............................................................................. 13

    A. Applicable Legal Standard Under the Federal Arbitration Act ......... 13

    B. Formation vs. Validity ............................................................... 16

    C. The Requirements Imposed by Puerto Rico Law on Government
       Contracts are Formation Requirements .................................. 19

    D. The District Court's Decision Must Be Reversed ................................. 33

CONCLUSION.......................................................................... 37

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ............................ 37

CM/ECF CERTIFICATE OF FILING AND SERVICE ................................ 38

ADDENDUM ........................................................................... 39

# TABLE OF AUTHORITIES

**Cases**

*Adams* v. *Suozzi*, 433 F.3d 220 (2d Cir. 2005) ...................................................... 15

*Ahlstrom* v. *DHI Mortg. Co., Ltd., L.P.*, 21 F.4th 631 (9th Cir. 2021) ................. 14

*Cecort Realty Dev. Inc.* v. *Llompart-Zeno*, 100 F. Supp. 3d 145
(D.P.R. 2015) ............................................................................... 19, 21, 28, 29

*Colón Colón* v. *Mun. de Arecibo*, 170. D.P.R. 994 (2009)................................... 27

*De Jesús González* v. *Autoridad de Carreteras*,148 D.P.R. 255 (1999) ......... 20, 30

*Dialysis Access Center, LLC v. RMS Lifeline, Inc.*, 638 F.3d 367
(1st Cir. 2011). ................................................................................... 1, 13

*Disaster Sols., LLC* v. *City of Santa Isabel, Puerto Rico*, 21 F.4th 1
(1st Cir. 2021) ................................................................................ 19, 20, 28

*Disaster Sols., LLC* v. *City of Santa Isabel, Puerto Rico*, 2019 WL 6719866 at *2
(D.P.R. 2019), *aff'd*, 21 F.4th 1 (1st Cir. 2021) ....................................... 21

*Edminster, Hinshaw, Russ & Assocs., Inc.* v. *Downe Twp.*, 953 F.3d 348
(5th Cir. 2020)......................................................................... 22, 30, 31

*Edwards* v. *Doordash, Inc.*, 888 F.3d 738 (5th Cir. 2018).................................. 14

*Escobar-Noble* v. *Luxury Hotels Int'l of P.R., Inc.,* 680 F.3d 118 (1st Cir. 2012)....
................................................................................................... 14, 18

*Farnsworth* v. *Towboat Nantucket Sound, Inc.,* 790 F.3d 90 (1st Cir. 2015) . 15, 18

*Fedor* v. *United Healthcare, Inc.*, 976 F.3d 1100 (10th Cir. 2020) ..................... 14

*First Options of Chicago, Inc.* v. *Kaplan*, 514 U.S. 938 (1995) .......................... 16

*Granite Rock Co.* v. *Int'l Bhd. of Teamsters*, 561 U.S. 287
(2010) ............................................................. 11, 12, 13, 14, 15, 16

*Henna* v. *Saure & Subirá*, 22 P.R.R. 776 (1915) .................................................. 33

*Kubala* v. *Supreme Prod. Servs., Inc.*, 830 F.3d 199 (5th Cir. 2016)................... 15

*Las Marías Reference Lab'y Corp.* v. *Mun. of San Juan*, 159 P.R. Dec. 868,
2003 WL 21706387, 2003 PR Sup. LEXIS 133 (2003) ................................. 20, 28

*Melendez Martinez* v. *Jimenez Realty, Inc.*, 98 D.P.R. 892 (1970)...................... 32

*Nat'l Fed'n of the Blind* v. *The Container Store, Inc.*, 904 F.3d 70
(1st Cir. 2018) ........................................................ 12, 14, 15, 16, 17, 22

*PDCM Assocs., SE* v. *Quiñones*, 2016 WL 8711711 (D.P.R. 2016).................... 21

*Quest Diagnostics v. Municipality of San Juan,* 175 D.P.R. 994
(D.P.R. 2009) ........................................................ 22, 23, 24, 32

*Rent–A–Center, W., Inc. v. Jackson,* 561 U.S. 63, 67 (2010)......................... 13, 16

*Rodriguez Ramos* v. *ELA*, 190 D.P.R. 448 (2014) ...... 18, 19, 21, 24, 25, 26, 33, 34

*Satellite Broadcasting Cable, Inc.* v. *Telefonica de España*, 786 F.Supp. 1089
(D.P.R. 1992) ........................................................ 32

*SBRMCOA, LLC* v. *Bayside Resort, Inc.,* 707 F.3d 267 (3rd Cir. 2013) ............. 15

*South Bay Boston Mgmt., Inc.* v. *United Here, Local 26*, 587 F.3d 35
(1st Cir. 2009) ........................................................ 13

*Sphere Drake Ins. Ltd.* v. *All Am. Ins. Co.*, 256 F.3d 587 (7th Cir. 2001) ........... 15

*WHTV Broad. Corp.* v. *Centennial Commc'ns Corp.*, 460 F. Supp. 2d 297
(D.P.R. 2006) ........................................................ 32

*Yacht Caribe Corp.* v. *Carver Yacht LLC*, 270 F. Supp. 3d 547
(D.P.R. 2017) ........................................................ 18, 20, 22

**Statutes**

Article VI, § 9 of the Puerto Rico Constitution, § 9, P.R. Laws Ann., Vol. 1 ...... 21

9 U.S.C. §16(a)(3)................................................................................................ 1

28 U.S.C. § 1332 ................................................................................................. 1

P.R. Laws Ann. tit. 3 § 1883b.................................................................... 6, 34, 35

P.R. Laws Ann. tit. 3 § 1883c ........................................................................ 6, 34

P.R. Laws Ann. tit. 3 § 8611 et. seq............................................................ 25, 26

P.R. Laws Ann. tit. 3 § 8615 .................................................................... 6, 26, 33

P.R. Laws Ann. tit. 24 § 343 ............................................................................... 2

P.R. Laws Ann. tit. 24 § 343(b) ......................................................................... 2

P.R. Laws Ann. tit. 31§ 3042 ............................................................................ 32

P.R. Laws Ann. tit. 31 3372................................. 13, 19, 20, 24, 29, 30, 31, 32, 36

P.R. Laws Ann. tit. 31 § 3391 ..................................................................... 19, 20

Pursuant to Rule 28(a) of the Federal Rules of Appellate Procedure, Appellant, Corporacion del Centro Cardiovascular de Puerto Rico y del Caribe ("CCPR"), respectfully submits its brief on appeal.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal. The district court had jurisdiction under 28 U.S.C. § 1332. On appeal, Appellant seeks review of the district court's *Opinion and Order* and *Judgment*, both entered on April 12, 2023, granting Appellees' *Joint Motion to Dismiss and to Compel Arbitration*, and dismissing the *Complaint* in its entirety. Addendum ("Add.")  1-14. On April 20, 2023, Appellant moved for reconsideration, which the district court denied on April 26. Add. 15. Appellant filed its *Notice of Appeal* on May 2, 2023. Appendix ("App.") 713. The district court's *Judgment* dismissing the case is "a final decision with respect to arbitration," and thus appealable under 9 U.S.C. §16(a)(3). *See Dialysis Access Center, LLC v. RMS Lifeline, Inc.*, 638 F.3d 367, 372 (1st Cir. 2011).

## STATEMENT OF THE ISSUE

Whether the district court erred in concluding that the failure to comply with certain statutory requirements imposed by Puerto Rico law on government contracts— the absence of which, the Puerto Rico Supreme Court has held, renders the contract "null and nonexistent"—does not affect the contract's formation but only its validity, and, as a result, compelling arbitration?

## STATEMENT OF THE CASE

The CCPR is a Puerto Rico public corporation created under Act No. 51 of 1986, as amended, to guarantee all citizens of Puerto Rico (and of the Caribbean), including indigent individuals, access to high-quality services and advanced treatments in the area of cardiovascular care. *See* P.R. Laws Ann. tit. 24 § 343, et seq. To achieve its purposes, the Puerto Rico legislature tasked CCPR with the obligation to structure and execute the government's policies relating to the planning, organization, operation, and administration of cardiovascular services throughout Puerto Rico, as well as to "perform, through its Board of Directors, the coordination needed to attain its ends and purposes with the Department of Health, the Medical Sciences Campus of the University of Puerto Rico, the Medical Services Administration and the private sectors involved in providing cardiovascular services in Puerto Rico." P.R. Laws Ann. tit. § 343(b). As part of its objectives, CCPR offers services at a public center, which includes a public hospital, that specializes in the individualized treatment and prevention of cardiovascular diseases and conditions.

CCPR has a long-standing relationship with Defendant-Appellee Cantata Health, LLC ("Cantata"). That relationship began on or around December 8, 2006, when CCPR entered into a service agreement with Cantata (through its predecessor-in-interest Keane, Inc.) (the "General Agreement"). App. 644-661.

On or about August 15, 2019, Defendants-Apellees Cantata and Medsphere Systems Corp. ("Medsphere") executed a *Medsphere Reseller Agreement* ("*Reseller Agreement*"). App. 84-153. By way of the Reseller Agreement, Medsphere granted Cantata a limited, non-exclusive, non-transferable license to re-sell certain software applications on a stand-alone basis to CCPR. App. 534-535. Section 6.3 of the Reseller Agreement provides that "[t]his agreement may be terminated by either party without cause upon thirty (30) days advance written advance notice to the other party." App. 86. The *Reseller Agreement* also attaches and incorporates a Master License and Subscription Agreement which Cantata and Medsphere agreed to be used as the agreement between Medsphere and CCPR for the use of the Medsphere software. App. 535.

Later that year, Cantata offered CCPR Medsphere's software and CCPR agreed. As a result, on or about December 20, 2019, CCPR and Cantata executed an *Amendment to their General Agreement* (the "*Amendment T*") to amend the *General Agreement* solely as follows:

> "A.     The Software Schedule is amended to include Medsphere Software with the product description and pricing as set forth in Schedule 1, attached hereto. All such Medsphere Software shall be considered Third Party Software.
> B.     CCPR agrees to be bound by the Medsphere Master License and Subscription Agreement, attached hereto as Schedule 2, and all use of the Medsphere Software by CCPR shall be subject to such agreement. For avoidance of doubt, Medsphere shall be solely

> responsible for all maintenance and support for the
> Medsphere Software."
> <u>App</u>. 154.

Hence, in a way, Cantata acted as a broker; CCPR would use the software,

Medsphere was solely responsible for maintenance and support, and Cantata acted

as the intermediary. The use of the Medsphere Software was governed by the

*Master License and Subscription Agreement* ("*Medsphere License and*

*Subscription Agreement*"), which was a form contract executed solely between

Cantata and CCPR. <u>App</u>. 158-187. Consistent with the fact that Cantata had no

obligations over the use or service of the software, Cantata is not a signatory of

that document. *See Id*. The *Medsphere License and Subscription Agreement*

governs the use of the Medsphere software during a five-year term. <u>App</u>. 162. The

Medsphere Agreement includes the following arbitration clause:

> Arbitration. This Agreement and the arbitration and all
> disputes determined therein shall be governed by
> California law (other than with respect to principles of
> conflicts of laws thereunder), except that issues relating
> to this arbitration clause and any arbitration hereunder
> shall be governed by the Federal Arbitration Act,
> Chapters 1 and 2. All disputes arising out of or in
> connection with the present Agreement shall be finally
> settled under the Rules of Arbitration of the American
> Arbitration Association by one arbitrator appointed in
> accordance with the said Rules. The arbitration shall be
> conducted in the English language. The place of
> arbitration shall be San Diego County, California. In
> addition to the Rules of Arbitration of the American
> Arbitration Association, the parties agree that the
> arbitration shall be conducted according to the IBA Rules

of Evidence. Except as may be required by law, neither a party nor its representatives nor a witness nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties. Judgment on the award may be entered in any court having jurisdiction thereof. The parties hereby waive all objection which it may have at any time to the laying of venue of any proceedings brought in such courts, waives any claim that such proceedings have been brought in an inconvenient forum and further waives the right to object with respect to such proceedings that any such court does not have jurisdiction over such party. Notwithstanding the foregoing, either party has the right to apply to any court of competent jurisdiction for provisional relief, including pre-arbitral attachments, a temporary restraining order, temporary injunction, permanent injunction and/or order of specific performance, as may appear reasonably necessary to preserve the rights of either party and to apply to a court of competent jurisdiction with respect to disputes regarding intellectual property rights. The application by either party to a judicial authority for such measures shall not be deemed to be an infringement or a waiver of the arbitration agreement and shall not affect the relevant powers reserved to the arbitrator. <u>App</u>. 164-165.

The Medsphere software, however, did not meet the expectations of CCPR and, in early 2022, CCPR informed both Medsphere and Cantata of its intention to terminate the *Medsphere License and Subscription Agreement*. <u>App</u>. 613. Medsphere disputed the termination and, on June 30, 2022, filed a *Demand for Arbitration* in California before the American Arbitration Association against both CCPR and Cantata as per Section 13 of the agreement. <u>App</u>. 621-637. Medsphere challenges the termination, demands payment of all *future* amounts to accrue

through the software license's remaining term, and seeks compensation of no less than $1,667,361.55. *See Id*. Medsphere further sought to enforce a choice-of-law clause in the agreements that provides that California law should apply to resolve all of the parties' disputes. <u>App</u>. 567.

In assessing the situation, CCPR examined the *Medsphere License and Subscription Agreement* and noted that it failed to comply with the certain conditions and requirements that Puerto Rico Public Law 237 of 2004 imposes on government contracts. Among the requirements:

- P.R. Laws Ann. tit. 3 § 8615, which requires the inclusion in government contracts of an extensive list of mandatory clauses, including, among others: "the legal provision authorizing the execution of the contract"; "[t]he budgetary item from which the fees of the contractor shall be paid"; "[a] clause indicating that the contracting government entity may rescind the contract by giving notice thirty (30) days prior to its being rescinded, or within a lesser term, depending upon the services to be contracted"; "[a] clause indicating that the agency may annul the contract immediately in cases of negligence, dereliction of duties or noncompliance by the contractor"; "a clause stating that, if required, the necessary dispensation has been obtained from any government entity and that said dispensation shall become part of the contracting record." The statute also lists a series of essential documents that must be included with every government contract with private parties.

- P.R. Laws Ann. tit. 3 §§ 1883b and 1883c, which require the inclusion of a clause pledging to "abide by the provisions of [the] Code of Ethics," and further requires the contractor to submit a statement under penalty of perjury that no executive, director or other identified officers or employees have been convicted or have pled guilty of certain crimes, and a termination clause providing for termination of the contract in the event any such officers and employees are convicted of certain crimes.

Moreover, given CCPR's understating that failure to comply with these requirements rendered the *Medsphere License and Subscription Agreement* (and, by extension, *Amendment T*) null and nonexistent, coupled with the expense and complexity of submitting complex substantive questions of Puerto Rico public contract law to an arbitral forum in the state of California, and the potential risks an arbitrator applies California law to such dispute, CCPR filed a *Complaint* for declaratory judgment against Medsphere in the Puerto Rico courts challenging, *inter alia*, the contract's formation. <u>App</u>. 46. CCPR *only* challenges the *Medsphere License and Subscription Agreement* and, by extension, *Amendment T*; the *General Agreement* between Cantata and CCPR is not at issue. <u>App</u>. 46-77.[1]

On September 2nd, 2022, Medsphere and Cantata filed a *Notice of Removal* in the district court. <u>App</u>. 8. One week later, they filed a *Joint Motion to Dismiss and to Compel Arbitration*. <u>App</u>. 533. CCPR opposed the motion arguing, *inter alia*, that "CCPR seeks a declaration that a software licensing agreement with Medphere is null and nonexistent for failure to comply with clear and specified formation requirements under Puerto Rico law," <u>App</u>. 545, and concluded its opposition by restating: "CCPR explicitly challenges the formation of the *Master License and Subscription Agreement*, as well as *Amendment T,* as null and nonexistent for failure to comply with clear and specified formation requirements

---

[1] The *General Agreement* contains a severability clause. <u>App</u>. 657.

under Puerto Rico law," App. 557. CCPR further argued that, because formation is a question for the courts to decide, the Court had to deny the motion to compel arbitration and resolve the issue. App. 549-557

On September 9, 2022, Medsphere and Cantata replied. In the reply, Appellees admitted that "this Court could in theory be called upon to determine whether the parties' General Agreement was ever formed (i.e., whether it exists)." App. 563. Nonetheless, Appellees mischaracterized CCPR's arguments and argued that the CCPR's

> arguments have nothing to do with the "formation" of these Agreements and instead relate to their validity. As explained *supra*, formation concerns whether the basic elements to contracting are met. As CCPRC admits, under Puerto Rico law the elements for a contract to "exist," or to be formed, are: "(1) that the contracting parties consented to enter the contract; (2) '[a] definite object which maybe the subject of the contract'; and (3) '[t]he cause for the obligation which may be established.'" Opposition at page 9. […] CCPRC focuses on the "additional requirements" found in Puerto Rican law, which concern only the validity of the relevant agreements.
> App. 564.

CCPR filed a sur-reply. CCPR began by pointing out that it squarely presented a formation challenge, but that Appellees failed to appreciate this fact. App. 585-591. CCPR then argued that the Supreme Court has repeatedly made

clear that Puerto Rico government contracts that fail to comply with statutory requirements are considered "nonexistent," and hence never formed. *See Id.*[2]

On April 12, 2023, the Court entered an *Opinion and Order* granting the *Motion to Compel,* and ordering the dismissal of the *Complaint* in its entirety. Add. 1-13.[3] A review of the *Opinion* seems to reflect that the district court characterized and resolved CCPR's challenge as *exclusively* a validity challenge, and did not consider CCPR's formation challenge. Add. 8 ("The crux of Plaintiff's Opposition to Defendants' Motion to Compel is that the Amended Agreement and the arbitration clause contained therein are invalid"); Add. 9 ("As the First Circuit stated in *Nat'l Fed. Of the Blind,* 'there is an important distinction between

---

[2] In the court below, CCPR also raised a validity challenge. Specifically, it argued that the arbitration clause itself was also invalid. CCPR nonetheless made clear that such a challenge was being made solely *in the alternative. See e.g.* App. 545-546 (noting that CCPR "also" challenges the validity of the arbitration agreement); App. 585 (same); App. 550 (discussing the validity challenge standard, which is "unlike controversies involving formation"); App. 557 (same); App. 590 (explicitly noting that CCPR validity challenge is an "argument in the alternative"). CCPR has chosen not to pursue its attack on the validity of the arbitration clause itself on appeal. Nonetheless, as discussed below, the crux of CCPR's argument was not, as the Court held (ECF No. 38 at 8), a question of validity, but rather one of formation.

[3] After the *Sur-Reply* was filed, but before the Court issued the *Opinion and Order,* Appellees filed two supplemental motions raising additional arguments in favor of arbitration. App. 601, 638. CCPR opposed the first supplemental motion. App. 614. It was drafting its response to the second supplemental motion (*see* App. 665) when the Court issued its *Opinion and Order*. In the *Opinion and Order* the Court recognized that the motions had been filed, but did not rule upon them because these were mooted by its ruling. Add. 4, n. 2.

arguments challenging the validity of an agreement and those challenging an agreement's formation.' . . . Plaintiff claims he is presenting the first kind of challenge, a validity challenge"); <u>Add</u>. 12 ("Plaintiff . . . limits itself time and again to challenging the Amended Agreement's validity, which is proper for the arbitrator to decide and not the Court"). The Court concluded that because CCPR's "validity" challenge was more properly directed to the contract as a whole, and not to the arbitration clause itself, which is an issue for the arbitrators to decide. That same day, the district court entered *Judgment* dismissing the complaint. <u>Add</u>. 14.

On April 20, 2023, CCPR moved for reconsideration. <u>App</u>. 688. CCPR explained that it had squarely raised a formation challenge to the *Medsphere License and Subscription Agreement*, that this was its primary challenge, and that its argument regarding the validity of the arbitration clause was raised solely in the alternative. <u>App</u>. 688-692. CCPR further argued that the district court erred in characterizing CCPR's argument as presenting *exclusively* a validity challenge, went on to restate its formation challenge, and maintained that the district court should have applied Puerto Rico Supreme Court precedents to hold that, insofar the *Medsphere License and Subscription Agreement* did not contain the mandatory clauses required under Puerto Rico law, it is null and nonexistent. <u>App</u>. 692-703. In other words, such an agreement was never formed.

Appellees opposed the motion for reconsideration and argued that "it is evident from this Court's Order […] that this Court fully understood and addressed Plaintiff's arguments and contentions, and determined that Plaintiff's claim that the parties' agreement fails to include 'clauses required by Puerto Rico law' goes to the question of whether the entire agreement is invalid, void, voidable or otherwise unenforceable. Accordingly, Plaintiff's defense goes to the validity of the parties' entire agreement and is thus properly for the arbitrator to decide." App. 707. Appellant further argued that the district court's holding that "all elements for a valid contract are present" necessarily implies that the district court found that a contract was validly formed. App. 708.

On April 26, 2023, the district court denied the motion for reconsideration "for the reasons set forth in Defendant's Opposition." Add. 15. The *Notice of Appeal* was filed on May 2, 2023. App. 713.

## SUMMARY OF THE ARGUMENT

"Arbitration is strictly 'a matter of consent.'" *Granite Rock Co.* v. *Int'l Bhd. of Teamsters*, 561 U.S. 287, 2999 (2010). The First Circuit has accordingly recognized that "a court should not compel arbitration unless and until it determines that the parties entered into a validly formed and legally enforceable agreement covering the underlying claims(s).' […] 'To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the

formation or applicability of the specific arbitration clause that a party seeks to have the court enforce.'" *Nat'l Fed'n of the Blind* v. *The Container Store, Inc.*, 904 F.3d 70, 80-81 (1st Cir. 2018) (quoting *Granite Rock*, 562 U.S. at 297).

This case concerns the *Medsphere License and Subscription Agreement's* (and, by extension, *Amendment T*) failure to comply with certain Puerto Rico statutory requirements and conditions with which every public contract must comply. The question presented is whether these requirements and conditions implicate the formation of the contracts, or whether they merely go to the validity of the same.

As discussed more fully below, the question is one of formation. Formation concerns whether an agreement exists, while validity requirements presuppose the existence of a legally formed agreement that is otherwise unenforceable or voidable for reasons other than formation deficiencies. Here, the Puerto Rico Supreme Court has repeatedly employed terminology consistent with formation requirements when referring to contracts that fail to comply with these requirements, using words such as "nonexistent," "null," lacking "constitutive element," or "not legally perfected."

The rulings of that Court (and of the District Court of Puerto Rico as well) make plain that these are formation requirements for at least two reasons. First, the Puerto Rico Supreme Court has held that these statutory requirements condition the

capacity to consent of the parties, and to commit the principal—which are indisputably formation requirements—until such requirements are complied with. Second, both Courts have also held that Article 1207 of the Puerto Rico Civil Code explicitly mandates that a contract that fails to comply with such statutory requirements is "null and nonexistent." P.R. Laws Ann. tit. 31 § 3372.

Because the district court held (albeit implicitly) that these requirements are not formation requirements, its *Judgment* must be reversed.

## STANDARD OF REVIEW

The First Circuit reviews "both the interpretation of arbitration agreements and orders compelling arbitration *de novo*." *Dialysis Access Center, LLC*, 638 F.3d at 373 (quoting *South Bay Boston Mgmt., Inc.* v. *United Here, Local 26*, 587 F.3d 35, 42 (1st Cir. 2009).

## ARGUMENT

### A. Applicable Legal Standard Under the Federal Arbitration Act

"Arbitration is strictly 'a matter of consent.'" *Granite Rock Co.* v. *Int'l Bhd. of Teamsters*, 561 U.S. 287, 2999 (2010). It "is a way to resolve those disputes— *but only those disputes*—that the parties have agreement to submit to arbitration." *Id.* at 297 (emphasis in original); *see also Rent–A–Center, W., Inc. v. Jackson,* 561 U.S. 63, 67 (2010). Accordingly, the Supreme Court has instructed that "courts should order arbitration of a dispute only where the court is satisfied that neither

the formation of the parties arbitration agreement not (absent a valid provision

specifically committing such disputes to an arbitrator) its enforceability or

applicability to the dispute is in issue." *See Granite Rock,* 561 U.S. at 299.

The First Circuit has accordingly recognized that "a court should not compel

arbitration unless and until it determines that the parties entered into a validly

formed and legally enforceable agreement covering the underlying claims(s).' […]

'To satisfy itself that such agreement exists, the court must resolve any issue that

calls into question the formation or applicability of the specific arbitration clause

that a party seeks to have the court enforce.'" *Nat'l Fed'n of the Blind* v. *The

Container Store, Inc*., 904 F.3d 70, 80-81 (1st Cir. 2018) (quoting *Granite Rock*,

562 U.S. at 297; *Escobar-Noble* v. *Luxury Hotels Int'l of P.R., Inc.,* 680 F.3d 118,

121-22 (1st Cir. 2012). Likewise, virtually all of the Circuit Courts that have

addressed the question have held that formation disputes are *always* for the courts

to decide. *See Ahlstrom* v. *DHI Mortg. Co., Ltd., L.P*., 21 F.4th 631, 635 (9th Cir.

2021) ("We agree with our sister circuits and hold that parties cannot delegate

issues of formation to the arbitrator"); *Fedor* v. *United Healthcare, Inc.*, 976 F.3d

1100, 1104 (10th Cir. 2020) ("Courts must ... first determine whether an arbitration

agreement was indeed formed before enforcing a delegation clause therein");

*Edwards* v. *Doordash, Inc.*, 888 F.3d 738, 744 (5th Cir. 2018) ("Arguments that an

agreement to arbitrate was never formed, though, are to be heard by the court even

where a delegation clause exists.... [This] test is limited to contract formation."

(citing *Kubala* v. *Supreme Prod. Servs., Inc.*, 830 F.3d 199, 202 (5th Cir. 2016));

*SBRMCOA, LLC* v. *Bayside Resort, Inc.,* 707 F.3d 267, 274 (3rd Cir. 2013)

("[R]elevant distinction is between challenges to a contract's validity, which are

arbitrable, and challenges to a contract's formation, which generally are not"). This

is rooted in the principle that formation implicates the very existence of a contract;

hence "as arbitration depends on a valid contract[,] an argument that the contract

does not exist can't logically be resolved by the arbitrator." *Sphere Drake Ins. Ltd.*

v. *All Am. Ins. Co.*, 256 F.3d 587, 591 (7th Cir. 2001); *see also Adams* v. *Suozzi*,

433 F.3d 220, 226 (2d Cir. 2005) ("If the contract embodying a

purported arbitration agreement never existed, the arbitration agreement itself does

not exist").[4]

---

[4] Unlike formation challenges, which are always for the courts to resolve, validity challenges may, depending on the circumstances, or may not go to an arbitrator. *See Nat'l Fed'n of the Blind*, 904 F.3d at 81. "The Supreme Court has differentiated between two types of challenges to the validity of arbitration agreements: (1) challenges to the validity of an entire contract which contains an arbitration clause, and (2) challenges to the validity of the specific agreement to resolve the dispute through arbitration. . . . [T]he Court has held that challenges of the first type are for the arbitrator to decide, whereas challenges of the second type are for the courts to decide, if timely and properly made." *Farnsworth* v. *Towboat Nantucket Sound, Inc.,* 790 F.3d 90, 96 (1st Cir. 2015). However, this latter rule does have an exception; the parties may incorporate a provision in their agreement specifically committing disputes to the validity of the arbitration clause itself to the arbitrator. *See Granite Rock,* 561 U.S. at 299.

In analyzing formation questions, courts generally apply principles of state law. *See First Options of Chicago, Inc.* v. *Kaplan*, 514 U.S. 938, 994 (1995) (Courts "apply ordinary state-law principles that govern the formation of contracts"); *see also Nat'l Fed'n of the Blind*, 904 F.3d at 80 ("general principles of state contract law control the determination of whether an agreement to arbitrate exists.")

### B. Formation vs. Validity

The First Circuit has recognized that:

> [p]ursuant to established Supreme Court precedent, however, there's an important distinction between arguments challenging the <u>validity</u> of an agreement and those challenging an agreement's <u>formation</u>. *See Buckeye [Check Cashing, Inc., v. Cardegna]*, 546 U.S. [440,] [ ] 444 n.1 ("The issue of the contract's validity is different from the issue [of] whether any agreement ... was ever concluded. Our opinion today addresses only the former."); *Rent-A-Center, West, Inc.* v. *Jackson*, 561 U.S. 63, 70 n.2 (2010) (same).
> "[C]ontract law defines formation as acceptance of an offer on specified terms." *Granite Rock Co.,* 561 U.S. at 304 n.11; *TLT Const. Corp.* v. *RI, Inc.,* 484 F.3d 130, 137 (1st Cir. 2007). One could challenge the formation of a contract by claiming one of the essential elements (offer, acceptance, and consideration) is missing. *See, e.g., Amedisys, Inc.* v. *Kingwood Home Health Care, LLC,* 437 S.W.3d 507, 513 (Tex. 2014). A challenge to formation can also be done by showing that one party never agreed to the terms of the contract, that a signatory did not possess the authority to commit the principal, or that the signor lacked the mental capacity to assent. *Buckeye,* 546 U.S. at 444 n.1; *see also In re Morgan Stanley & Co.,* 293 S.W.3d 182, 187 (Tex. 2009)

(concluding that in Texas, issues of mental capacity call into question the ability of a party to assent and, therefore, challenge the existence of a contract). Under Texas law, asserting that an agreement is illusory raises a challenge to the formation of the agreement because when an agreement is illusory it is unsupported by consideration, and thus, "there is no contract." *See Lizalde* v. *Vista Quality Mkts.,* 746 F.3d 222, 225–26 (5th Cir. 2014) (finding that an agreement to arbitrate is illusory if one party can avoid arbitration by amending or eliminating the arbitration clause). On the other hand, a challenge to validity requires consideration of the enforceability of the agreement and if it is void or voidable. *Granite Rock Co.,* 561 U.S. at 301; *Buckeye*, 546 U.S. at 448-49. Like formation, this challenge requires a look at relevant state law. *Perry* v. *Thomas*, 482 U.S. 483, 492 n.9 (1987). Some challenges that attack the validity of an agreement include duress, inducement, and fraud. *See S.C. Maxwell Family P'ship, Ltd.* v. *Kent*, 472 S.W.3d 341, 344 (Tex. App. 2015) (stating that in Texas fraud or inducement are challenges to a contract's validity). *Nat'l Fed'n of the Blind* v. *The Container Store, Inc.,* 904 F.3d 70, 80–81 (1st Cir. 2018) (emphasis in original; footnote omitted[5]).

Consequently, formation issues concern whether an agreement exists, while validity requirements presuppose the existence of a legally formed agreement that is otherwise unenforceable or voidable for reasons other than formation

---

[5] In the omitted footnote, the First Circuit cites 7 Philip L. Bruner & Patrick J. O'Connor *Construction Law* § 21:73 (2018), where it is explained that "Broad arbitration agreements have been found to cover challenges to the validity of the entire contract on such grounds as duress, unconscionability, coercion, frustration of purpose, lack of mutuality, capacity, confusion in signing and, of course, fraud.") (collecting cases). See *Nat'l Fed'n of the Blind,* 904 F.3d at 81 n. 14.

deficiencies. *See Id.*; *see also*, *Farnsworth* v. *Towboat Nantucket Sound, Inc.*, 790 F.3d 90, 97 n. 97. (1st Cir. 2015) (noting that formation involves the question of whether the contract was "consummated").[6] Thus, when a court refers to a contractual requirement as one implicating a contract's "existence," or when it considers whether a contract was "consummated" or "perfected," it is unquestionably addressing the contract's formation.[7]

In this case, as discussed, the district court was called upon to decide whether certain statutory requirements applicable to government contracts are formation requirements under Puerto Rico law. As discussed below, the Puerto Rico Supreme Court has repeatedly employed terminology consistent with

---

[6] Black's Law Dictionary (11th ed. 2019) defines the verb "consummate" as, *inter alia*, "to bring to completion" or "to perfect."

[7] However, despite their difference, some court opinions, including opinions cited below, employ terms such as "valid" and "enforceable" when addressing formation questions. *See e.g. Escobar-Noble*, 680 F.3d 121-22 ("a court should not compel arbitration unless and until it determines that the parties entered into a validly formed and legally enforceable agreement"); *Yacht Caribe Corp.* v. *Carver Yacht LLC*, 270 F. Supp. 3d 547, 555 (D.P.R. 2017) (Gelpí, J.) ("The requirements for the formation of an enforceable contract under the Puerto Rico Civil and Commerce Codes are different than those established under Law 75 for the existence of a dealership relationship between a principal or grantor and a dealer"); *Rodriguez Ramos* v. *ELA*, 190 D.P.R. 448, 455 (2014), <u>Add</u>. 25 (Certified Translation) ("The contract will be valid as long as the following requisites concur" and proceeding to identify formation requirements). This is perfectly understandable because a valid and enforceable contract necessarily requires formation; an agreement that has not been legally (or validly) formed cannot be considered valid or enforceable. The opposite, however, is not true.

formation requirements when describing contracts that fail to comply with these requirements as "nonexistent," "null," lacking "constitutive element," or as "not legally perfected."

### C. The Requirements Imposed by Puerto Rico Law on Government Contracts are Formation Requirements

Under Puerto Rico law,[8] a legally formed agreement must have three elements: (1) consent of the contracting parties; (2) a definite object which may be the subject of the contract; and (3) cause for the obligation that is being established. *See* Article 1213 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, § 3391. Moreover, Article 1207 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, 3372, requires, as a condition for formation, that the contract does not contravene the laws, morals or public order. *See Rodriguez Ramos* v. *ELA*, 190 D.P.R. 448, 456 (2014), Add. 25 (Certified Translation) ("the contract will be null and nonexistent if it is contravention of the law, morals, or public order"); *Cecort Realty Dev. Inc.* v. *Llompart-Zeno*, 100 F. Supp. 3d 145, 155 (D.P.R. 2015) ("The contracting parties may make the agreement and establish the clauses and conditions which they may deem advisable, provided they are not in contravention

---

[8] Puerto Rico enacted a new Civil Code effective November 28, 2020. Because the alleged contract pre-dates the effective date of the new Civil Code, the parties, as the district court, have addressed the controversy under the 1930 Civil Code. *See e.g. Disaster Sols., LLC* v. *City of Santa Isabel, Puerto Rico*, 21 F.4th 1, 6 (1st Cir. 2021)

of the law, morals, or public order. Article 1207 of the Puerto Rico Civil Code, 31 L.P.R.A. s. 3372. It is for this reason that, independently of the type of contract and the importance it may have for the contracting parties, a contract is deemed null and, therefore, nonexistent, if it is contrary to law, morals or public order") (quoting *De Jesús González* v. *Autoridad de Carreteras*,148 D.P.R. 255, 263-69 (1999) (certified translation)).

However, Puerto Rico law also imposes additional formation requirements depending on the circumstances. *See e.g. Disaster Sols., LLC* v. *City of Santa Isabel, Puerto Rico*, 21 F.4th 1, 6 (1st Cir. 2021) ("Under Puerto Rico law, to establish that an enforceable contract exists, a plaintiff must show (1) that the contracting parties consented to enter the contract; (2) '[a] definite object which may be the subject of the contract'; and (3) '[t]he cause for the obligation which may be established.' Contracts between private parties and Puerto Rico municipalities, however, are not enforceable unless additional requirements are met. […] "[M]unicipal contracts that are not sent to the [Puerto Rico comptroller] are not enforceable because these are not deemed legally perfected.'" (quoting P.R. Laws Ann. tit. 31, § 3391; *Las Marías Reference Lab'y Corp.* v. *Mun. of San Juan*, 159 P.R. Dec. 868, 2003 WL 21706387 at ——, 2003 PR Sup. LEXIS 133 at *6 (2003)); *Yacht Caribe Corp.* v. *Carver Yacht LLC*, 270 F. Supp. 3d 547, 555 (D.P.R. 2017) (Gelpí, J.) ("The requirements for the formation of an

enforceable contract under the Puerto Rico Civil and Commerce Codes are different than those established under Law 75 for the existence of a dealership relationship between a principal or grantor and a dealer. The Puerto Rico Commerce Code imposes an additional requirement for the enforcement of commercial contracts whose amount exceeds three hundred dollars: the essential elements must be in written form or otherwise corroborated by non-verbal evidence.")

More relevant here, contracts between private parties and government entities are also subject to such additional requirements that are considered "strict" and which are strictly enforced. *See Disaster Sols., LLC* v. *City of Santa Isabel, Puerto Rico*, 2019 WL 6719866 at *2 (D.P.R. 2019), *aff'd*, 21 F.4th 1 (1st Cir. 2021) (quoting *PDCM Assocs., SE* v. *Quiñones*, 2016 WL 8711711 at *5 (D.P.R. 2016)). This is so because public contracts are subject to constitutional limitations on the Commonwealth. *See Id*. ("Pursuant to the Constitution of the Commonwealth of Puerto Rico, the State has an obligation 'to apply the highest fiduciary and ethical principles when managing public funds'" (quoting *Cecort Realty Dev. Inc.*, 100 F.Supp. 3d at 157-58; *Rodríguez Ramos* v. *ELA*, 190 D.P.R. at 456, Add. 25). Specifically, Article VI, § 9 of the Puerto Rico Constitution, which provides that "Public property and funds shall only be disposed of for public

purposes, for the support and operation of state institutions, and pursuant to law."
Puerto Rico Const. Art. VI, § 9, P.R. Laws Ann., Vol. 1.

As to these statutory requirements applicable to public contracts, the Puerto
Rico Supreme Court has made clear, in no uncertain terms, that they are formation
requirements, and that public contracts that fail to comply with such requirements
are "nonexistent," and hence never formed, for at least two reasons.

*First*, Puerto Rico's highest Court has explained that failure to comply with
the statutory requirements implicates the contract's formation because it conditions
the capacity to consent of the parties, and to commit the principal, which are
indisputably formation requirements, until such requirements are complied with.
*See Nat'l Fed'n of the Blind,* 904 F.3d at 80-81 (noting that "[a] challenge to
formation can also be done by showing . . . that a signatory did not possess the
authority to commit the principal"); *see also Edminster, Hinshaw, Russ & Assocs.,
Inc.* v. *Downe Twp*., 953 F.3d 348, 350-51 (5th Cir. 2020) ("To form a contract,
each party must have capacity. […] [A] municipality that lacks legislative
authority to enter into an agreement is another type of incapacity" (citations
omitted)). To be sure, in *Quest Diagnostics v. Municipality of San Juan* the Puerto
Rico Supreme Court addressed a similar requirement as the one Judge Gelpí was
referring to in *Yacht Caribe Corp*. (i.e. a legal requirement that contracts between
private parties and government entities must be in writing), but under a different

statute applicable specifically to government contracts. *Quest Diagnostics v. Municipality of San Juan,* 175 D.P.R. 994 (D.P.R. 2009), <u>Add</u>. 16 (Certified Translation). The Court explained that this requirement implicates a contract's formation because it—like other requirements imposed "through special statutes"—operates as a "legal bar" on the capacity to consent and commit the principal. Specifically, the Court noted:

> Art. 1213 demands that, for a valid contractual relationship to exist, the essential elements of consent and cause must concur. Art. 1214 provides that consent is expressed by the concurrence of the offer and acceptance of the thing and the cause which are to constitute the contract.
> These requirements are essential, meaning that their absence prevents <u>*the existence*</u> of the contract. Consent comprises "two fundamental and very different aspects: the ability to consent and the giving of consent." *Art. 1216 of our Civil Code Recognizes the potential restrictions on the ability to consent that can be established by law*. This provision comprises the legal prohibitions affecting specific persons regardless of their strictly personal conditions. This legal precept refers to contracting parties "who are legally barred from giving their consent in specific cases for reasons of morality or convenience."
> <u>*To those effects*</u>, *through special statutes, the lawmaker has imposed requisites and conditions on the execution of contracts with the municipalities*.
> *Id*. at 999-1000 (footnotes and citations omitted; emphasis added).

The Court rejected the applicability of general principles of contract law (pursuant to which verbal contracts are just as valid) and concluded, among other

things, that "letters to extend the effective term of the legal relationship between the parties *cannot be considered a contract* between [the] parties, since said letters do not comply with the legal requirements to constitute a written contract that is binding on the Municipality." *Id*. at 1005. Hence, the Court concluded that the statutory requirements—validly enacted pursuant to Article 1216 of the Civil Code—limit a public official's capacity to consent and to commit the principal, and the failure to comply with such requirements "prevents the existence of the contract."

*Second*, the Puerto Rico Supreme Court has noted that failure to comply with statutory requirements further implicates formation because this contravenes Article 1207 of the Civil Code, P.R. Laws Ann. tit. 31, § 3372. In *Rodriguez Ramos*, 190 D.P.R. at 455, Add. 35, the Puerto Rico Supreme Court confronted the issue of whether a verbal contract between a provider of legal services and the Government can be subsequently validated through the execution of a written contract. As in *Quest Diagnostics*, the Court squarely rejected that premise because the contract was never formed in the first place.

The Court began its legal analysis by citing Article 1207 of the Civil Code, according to which a "contract will be null and nonexistent if it is in contravention of the law, morals, or public order. […] This is regardless of the type of contract and its importance to the contracting parties. […] In such cases, any of the

contracting parties may challenge the contract, even if they have benefited from it." *Rodriguez Ramos*, 190 D.P.R. at 456, <u>Add</u>. 25 (citations omitted). Moreover, as particularly relevant here, the Court went on to discuss the government contracting principles and applied Article 1207 to those principles.

> B. *Government Contracting*
> Regarding government contracting, the State is bound, by constitutional decree, to manage public funds in keeping with the highest fiduciary and ethical principles. *Jaap Corp. v. Depto. Estado et al.*, 187 DPR 730, 739 (2013); *C.F.S.E. v. Unión de Médicos*, 170 DPR 443, 452 (2007). In particular, Sec. 9 of Art. VI of our Constitution establishes that "[p]ublic assets and funds shall only be used for public purposes and for the maintenance and functioning of the institutions of the State, and always by authority of law." Art. VI, Sec. 9, Const. Commonwealth, LPRA, Volume 1, ed. 2008, at p. 429.
> *To comply with this constitutional mandate, the Legislature has enacted laws that impose fiscal and government contracting controls. Jaap Corp. v. Depto. Estado et al., supra. Thus, in accordance with the above-cited provisions of the Civil Code<u>, a contract between a private party and the State that does not comply with said laws shall be</u> <u>null and nonexistent</u>. Art. 1207 of the Civil Code, supra.* With this in mind, let us see the legal provisions that apply to the contract before us.
> *Rodriguez Ramos*, 190 D.P.R. at 456-57, <u>Add</u>. 25 (emphasis added).

Importantly, the legal provisions that the court went on to analyze are those in Law No. 237 of 2004, 3 P.R. Laws Ann. tit. 3 § 8611, et. seq., "known as the Law to Establish Uniform Parameters in the Processes for Contracting Professional or Consulting Services for Government Agencies and Entities, as amended, 3

LPRA secs. 8611–8615 (Public Law No. 237-2004)." *Id*. at 458, <u>Add</u>. 26. This is the very statute at issue in this case. The Court described the statute as follows:

> In addition to establishing that government contracting of professional services must be exceptional, Public Law No. 237-2004 lists in its Art. 3 a number of requirements, both formal and substantive, that any contract between the State and a contractor must fulfill. 3 LPRA sec. 8613. Specifically, said article requires that:
>> (a) "The execution of a professional or consulting services contract between a contractor and the Government be *prospective*. The government entities shall pay solely for the services rendered.
>> (b) The legal provision that authorizes the government entity to grant contracts shall be formalized in writing and included in the text of the contract." *[Official translation]* (Emphasis added.) *Id*.
> The rest of the paragraphs of this legal provision detail the information that the contract must contain about the contractor, the services that the contractor will provide, the duration of the contract, the maximum amount to be paid, and the method of payment. *Id*. Then, Art. 5 of the same law, 3 LPRA sec. 8615, requires the inclusion in the contract of an extensive list of mandatory clauses. *Id*. at 458-59 <u>Add</u>. 26.

The Court did not cite to any specific provision requiring that the contract must be in writing, but rather interpreted the cited provisions—the very same provisions at issue in this case—to hold: "[w]e thus see that Public Law No. 237-2004 provides that any government contract for professional or consulting services, which category includes the provision of legal services, is valid only if it is reduced to writing and has prospective effect. Without a doubt, Public Law No. 237- 2004

prohibits the verbal and retroactive contracting of professional and consulting

services." *Id*. at 459, <u>Add</u>. 26-27. The Court further noted:

> *demanding that contracts be reduced to writing has an*
> *unavoidable dimension of sound public administration*,
> as it allows for the safeguarding of the interests of the
> contracting parties in the event of non-compliance,
> allows for the orderly use of municipal funds, prevents
> uncertainty in the preparation of the municipal budget,
> and makes it possible to properly identify the item
> against which public disbursements will be made in
> compliance with the law. That is, the former are mostly
> procedural in nature and can be processed in an orderly
> manner, but the latter is substantive because of its direct
> relationship with sound public administration.
> Accordingly, we must conclude that the *failure to comply*
> *with the requirement that municipal contracts be reduced*
> *to writing forcibly has an adverse impact on the*
> *effectiveness of the obligations undertaken.*

*Id*. at 463, <u>Add</u>. 28 (quoting *Colón Colón* v. *Mun. de Arecibo*, 170. D.P.R. 994,

1002 (2009)) (emphasis in original). The Court then concluded that "Public Law

No. 237-2004 requires that all government contracts […] be made in writing and

with prospective effect." *Id*. at 465, <u>Add</u>. 29. The Court further concluded that the

contract at issue was "contrary to the law," and therefore "null" under Article

1207. *Id*. at 466, <u>Add</u>. 29.[9]

---

[9] In the court below, Appellees argued that simplistically argue that because some
holdings also refer to the contracts being "valid" and "enforceable" which terms,
"of course" go[] to the question of the validity of a contract," the question then
becomes one about validity. <u>App</u>. 564-565. However, such an argument puts form
over substance. In each instance, courts are referring to validly formed agreements,

Further, in *Las Marías Reference Lab'y Corp.* v. *Mun. of San Juan*, 159 P.R. Dec. 868, 2003 WL 21706387 at ——, 2003 PR Sup. LEXIS 133 at *1 (2003), the Puerto Rico Supreme Court considered yet another legally imposed requirement at the time: whether "the failure to remit a municipal contract to the Office of the Controller, as required by the Autonomous Municipalities Act of the Commonwealth of Puerto Rico of 1991, renders said contract ineffective." In answering that question in the affirmative, the Court employed language associated with a lack of formation. The Court explained that "compliance with that requirement is a *constitutive element* of every municipal contract." *Id.* (emphasis ours). The Court further elaborated on this conclusion by categorically holding that "municipal contracts that are not sent to the Controller are not enforceable *because these are not deemed legally perfected.*" *Id.* (emphasis ours). Notably, the First Circuit followed and quoted *Las Marías* to reach a similar result in *Disaster Sols., LLC*, 21 F.4th at 1.

The District of Puerto Rico has similarly held. In *Cecort Realty Dev. Inc.,* the district court faced a controversy where the Office of Courts Administration of Puerto Rico terminated a lease agreement involving two high-rise buildings. The landlord sued the Administration alleging that it canceled the agreement

---

or simply using that terminology for the simple reason that an agreement that is not legally formed is not a valid and enforceable one. *See* n. 8, *supra*.

prematurely, and brought a myriad of claims including Takings and Due Process claims. The district court nonetheless found that the landlord lacked property rights, and denied the constitutional claims. The district court based that determination, in part, on its conclusion that the lease agreement was null and void insofar as it was entered into without public bidding when Puerto Rico law required that lease agreements like the one at issue be subject to public bidding. In so holding, the Court acknowledged that:

> The Puerto Rico Supreme Court case law is crystal clear in pointing out that public contracts which do not follow the strict letter of the law, including public bidding, are null and void under section 1207 of the Civil Code, P.R. Laws Ann. tit. 31, § 3372 (1930), for they infringe principles of public order in the management of public moneys. Lack of bidding is not the only circumstance that leads to nullity. Others of less economic impact are equally treated by the case law, the point being that there is no way to elude strict compliance with law and regulation, no matter how laudable the purpose is behind the contractual relationship.

*Cecort Realty Dev. Inc.,* 100 F.Supp. at 157. Moreover, after an in-depth analysis of Puerto Rico Supreme Court case law on government contracting, the court held that, under Article 1207 of the Civil Code, 31 P.R. Laws Ann. tit. 31§ 3372, "[t]he contracting parties may make the agreement and establish the clauses and conditions which they may deem advisable, provided they are not in contravention of the law, morals, or public order. Article 1207 of the Puerto Rico

Civil Code, 31 L.P.R.A. s. 3372. It is for this reason that, independently of the type of contract and the importance it may have for the contracting parties, a contract is *deemed null and, therefore, nonexistent*, if it is contrary to law, morals or public order." *Id*. at 161 (quoting *De Jesús González*, 148 D.P.R. at 263-69) (emphasis added).

Therefore, under Puerto Rico law, public contracts that fail to comply with the statutory requirements are not considered validly formed because (1) those restrictions operate as a limitation on a public official's capacity to consent or to commit the principal, and (2) Article 1207 of the Puerto Rico Civil Code mandates that a contract that contravenes such legal requirements is "null and nonexistent." Notably, Puerto Rico is not unique in this field. In *Downe Twp*., a party brought a contractual dispute demanding payment under a professional services agreement against New Jersey township. New Jersey Public Contracts Law, however, required that the township only enter into contracts such as the one at issue "'by resolution of the governing body,'" which "'must state supporting reasons for awarding the contract in its resolution and publish notice of the resolution in 'the official newspaper.'" 953 F.3d at 350 (citations omitted). In resolving the dispute, the Fifth Circuit, after analyzing New Jersey law, noted that "[a]s a result of the Public Contracts Law, purported 'contracts' that New Jersey township's governing

body does not approve are not contracts. […] In other words, they do not exist." *Id*.

(citations omitted). The court further noted, in no uncertain terms:

> "The requirements of the New Jersey Public Contracts
> Law go to this preliminary question of contract
> formation. To form a contract, each party must have
> capacity. 5 Williston on Contracts § 9:1 (4th ed. 2019).
> Common examples of those who lack capacity are
> minors or incompetent adults. *Id.* Although a less
> prominent example, a municipality that lacks legislative
> authority to enter into an agreement is another type of
> incapacity. *See, e.g., Carolina Power & Light Co. v.
> Darlington Cty.*, 315 S.C. 5, 431 S.E.2d 580, 583 (1993)
> (characterizing a city official's "lack of authorization
> from the municipal government" to contract as a capacity
> problem); *cf. Kress*, 762 A.2d at 687 (explaining that a
> New Jersey municipality lacks power to enter into a
> contract unless it complies with the Public Contracts
> Law); Williston on Contracts, *supra*, § 11:10 (discussing
> the capacity of corporations to enter into contracts)." 953
> F.3d at 350-51 (emphasis added). […] [The contractor]
> argues that a municipality's incapacity is not as big a deal
> as a minor's incapacity. But there are not degrees of
> capacity. A party has the power to contract or it does not.
> Without capacity, there is no contract.
> *Id*. at 351-52.

In sum, the Puerto Rico Supreme Court has made it abundantly clear that

failure to comply with the requirements imposed by Puerto Rico law on

government contracts are formation requirements both because they condition the

capacity to consent and because failure to comply with statutory requirements

renders a contract null and nonexistent under Article 1207 of the Puerto Rico Civil

Code. Moreover, a review of the decisions of that Court, as well as the District of

Puerto Rico, makes plain that they repeatedly refer to wording suggestive of formation requirements; referring to contracts that fail to comply as "nonexistent," "null," lacking a "constitutive element," or as "not deemed legally perfected." These requirements further implicate formation because they constitute substantive conditions precedent to the formation and existence of public contracts. Under the doctrine, "the acquisition of rights, as well as the extinction or loss of those already acquired, shall depend upon the event constituting the condition." 31 P.R. Laws Ann. § 3042. And the Puerto Rico government is free to condition its consent to a particular obligation by inserting, into a contract a condition precedent, or to do so by statute, as it does here. *See Quest Diagnostics,* 175 D.P.R at 1000-01, <u>Add</u>. at 17. ("Art. 1216 of our Civil Code acknowledges the possible restrictions to the capacity to consent that can be established by law")). Because, "[i]n the words of the Supreme Court of Puerto Rico, 'while the condition precedent is pending it can be said that the obligation does not exist," failure to comply with such substantive conditions presupposes a lack of formation. *WHTV Broad. Corp.* v. *Centennial Commc'ns Corp.*, 460 F. Supp. 2d 297, 304 (D.P.R. 2006) (quoting *Melendez Martinez* v. *Jimenez Realty, Inc.*, 98 D.P.R. 892, 898 (1970); *see also Satellite Broadcasting Cable, Inc.* v. *Telefonica de España*, 786 F.Supp. 1089, 1095 (D.P.R. 1992) ("*it is plain that so long as the condition is not realized; and as the volition is the contract within the purest consensual sense, it is clear that there is no*

*contract because the element of consent is not perfected and the perfection of consent is consubstantially the perfection of the contract.*" (emphasis in original) (quoting *Henna* v. *Saure & Subirá*, 22 P.R.R. 776 (1915)).

### D. The District Court's Decision Must Be Reversed

In this case, CCPR maintains that the *Medsphere License and Subscription Agreement* (and, by extension *Amendment T*) fails to comply with the very provisions in Puerto Rico Public Law No. 237-2004 at issue in *Rodriguez Ramos*. Those provisions require the incorporation certain clauses in every government contract, including, among others: "the legal provision authorizing the execution of the contract"; "[t]he budgetary item from which the fees of the contractor shall be paid"; "[a] clause indicating that the contracting government entity may rescind the contract by giving notice thirty (30) days prior to its being rescinded, or within a lesser term, depending upon the services to be contracted"; "[a] clause indicating that the agency may annul the contract immediately in cases of negligence, dereliction of duties or noncompliance by the contractor"; "a clause stating that, if required, the necessary dispensation has been obtained from any government entity and that said dispensation shall become part of the contracting record." P.R. Laws Ann. tit. 3 § 8615. The statute also lists a series of essential documents that must be included with every government contract with private parties.

In *Rodriguez Ramos*, the Puerto Rico Supreme Court reached its conclusion that the contract at issue was never formed by relying on these provisions. As noted, even though the statute does not contain an explicit requirement that the contract be reduced to writing, the Court relied on the fact that it provides several mandatory clauses that must be included in the contract to conclude that the contract had to be reduced to writing. It would be an inherent contradiction to conclude that a contract must be in writing because Public Law No. 237-2004 mandates a series of mandatory clauses to be included and that this is a formation requirement, but that the clauses themselves do not have to be included, or that the exclusion of those clauses does not implicate formation.

Moreover, CCPR further maintains that *Medsphere License and Subscription Agreement* (and, by extension *Amendment T*) fails to comply with P.R. Laws Ann. tit. 3 §§ 1883b and 1883c. That statute requires private entities interested in "perfecting contracts" with government entities to ensure that the contract meets certain "indispensable requirements." *Id.* Among the requirements: the contract must include a clause pledging to "abide by the provisions of [the] Code of Ethics," the contractor must provide a statement under penalty of perjury that no executive, director or other identified officers or employees have been convicted or have pled guilty of certain crimes, and the contract must contain a termination clause providing for termination of the contract in the event any such

officers and employees are convicted of certain crimes. P.R. Laws Ann. tit. 3 §§ 1883b-1833c. The statute, by its very terms that these requirements must be complied in "perfecting contracts, lists formation requirements. And, failure to comply with these requirements renders a contract "nonexistent" for the principles mentioned in the prior section.

However, the court below did not refer to any of these provisions specifically, or to Puerto Rico Supreme Court case law. Instead, the district court broadly characterized CCPR's arguments as arguing that the arbitration clause was invalid "because the Amended Agreement lacks the mandatory clauses that Puerto Rico contract law requires for valid contractual relationships between private and Government entities." <u>Add</u>. at 10. As noted above, this is a mischaracterization of CCPR's arguments; CCPR squarely, clearly, and from the outset raised a formation challenge. Moreover, in misconstruing the argument, the district court then conclusorily held that "[t]his is the type of argument that falls squarely within the first type of validity challenges, which the Supreme Court has repeatedly stated is an argument for the arbitrator, not the court, to determine." *Id*. The court further held that "[u]pon review of the [arbitration clause] the Court finds that all elements for a valid contract are present. Moreover, Plaintiff fails to argue that these elements are vitiated in any way, but instead limits itself tune and time again to challenging the Amended Agreement's validity, which is proper for the arbitrator

to decide and not the Court." Add. at 12. But putting aside the fact that this again mischaracterizes CCPRs argument as a validity challenge (which prevented the district court from conducting the correct analysis), and further putting aside the fact that the district court does not identify the "elements" it refers to; CCPR *did* argue that failure to comply with public contracting requirements vitiated the capacity to consent of the parties, and their power to bind the principal, and contravened Article 1207 of the Puerto Rico Civil code, all of which implicates the formation of the contract.

There is no dispute that these requirements were not followed in this case. There should also be no dispute that compliance with these clauses constitutes a formation requirement both because, in their absence, a public official lacks the capacity to consent and to commit the principal, and because failure to comply with the statutory mandate renders the contract null and nonexistent. Just like the requirement that a contract be put in writing is a formation requirement or condition, absent which the contract cannot be considered to exist, the very contractual clauses that must be included in such written contract are as well. The court below failed to take heed of the clear pronouncements of the Puerto Rico Supreme Court (and of the District of Puerto Rico as well). Consequently, this Court must step in and reverse an opinion that rewrites clear and developed pronouncements of the Puerto Rico Supreme Court by reclassifying what are

otherwise formation requirements and conditions that go to the very existence of a

public contract as validity requirements, which do not, in an area as sensitive as

public contracting.

## CONCLUSION

The *Judgment* of the district court must be reversed.

### CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

**Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements**

1.  This brief complies with the type-volume limitation of Fed. R. App. P 32(a)(7)(B)(ii) because:

   ☒ this brief contains 9,389 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

   ❑ this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ This brief has been prepared in a proportionally spaced typeface using [***Microsoft Word***] in [**Times New Roman, size 14**], or

   ❑ This brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

(s) *Eliezer A. Aldarondo-López*
              Eliezer A. Aldarondo-López
Attorney for: Corporacion del Centro Cardiovascular de Puerto Rico y del Caribe
Dated:              December 8, 2023

**CM/ECF CERTIFICATE OF FILING AND SERVICE**

I HEREBY CERTIFY: that today December 12, 2023, a true copy of this brief has been electronically served by the Notice of Docketing Activity to all attorneys of record, in compliance with the Rules of the Federal Rules of Appellate Procedure and the Rules of the Administrative Order Regarding Case Management/Electronic Case Files System ("CM/ECF") of the US Court of Appeals for the First Circuit.

In Guaynabo, Puerto Rico this 12th day of December, 2022.


*s/ Eliezer A. Aldarondo-López*
Eliezer A. Aldarondo-López

# United States Court of Appeals for the First Circuit

---

CORPORACION DEL CENTRO CARDIOVASCULAR DE PUERTO RICO Y EL CARIBE,

Plaintiff – Appellant,

v.

MEDSPHERE SYSTEMS CORPORATION; CANTATA HEALTH, LLC;

Defendants – Appellees.

RICHARD ROE; INSURER X,

Defendants.

---

On Appeal from the United States District Court for the District of Puerto Rico
Civil Case No. 22-cv-1425-CVR

---

## ADDENDUM

---

ELIEZER A. ALDARONDO-LÓPEZ
BAR NO. 124875
*Counsel of Record*
ALDARONDO & LÓPEZ-BRAS, LLC
ALB Plaza, Suite 400
16 Las Cumbres Ave.
Guaynabo, PR 00969
Tel.: (787) 474-5447
Email: eliezer.aldarondo@alblegal.net

December 12, 2023

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

*Opinion and Order*, ECF Document No. 38 ............................................................. 1

*Judgment*, ECF Document No. 40 ......................................................................... 14

*Order Denying Motion for Reconsideration,* ECF No. 44 ..................................... 15

*Quest Diagnostics of Puerto Rico, Inc.* v. *Municipality of San Juan,* 175 D.P.R. 994 (2009) (Certified Translation) ......................................................... 16

*Rodríguez Ramos* v. *Commonwealth of PR,* 190 D.P.R. (2014) (Certified Translation) ........................................................................................... 22

CM/ECF CERTIFICATE OF FILING AND SERVICE ....................................... 33

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| CORPORACIÓN DEL CENTRO CARDIOVASCULAR DE PUERTO RICO Y EL CARIBE, <br><br> Plaintiff, <br><br> v. <br><br> MEDSHERE SYSTEMS CORP., et al., <br><br> Defendants. | CIVIL NO. 22-1425 (CVR) |

**OPINION AND ORDER**

**INTRODUCTION**

The present case arises out of a software licensing agreement between the parties that included an arbitration clause.  On August 1, 2022, Plaintiff Centro Cardiovascular de Puerto Rico y el Caribe ("CCPRC" or "Plaintiff") filed suit in the Puerto Rico Court of First Instance, seeking a declaratory judgment as to both the contract, and the forum selection and arbitration clause contained therein, to declare them null and void.  (Docket No. 1, Exhibit 6).  On September 2, 2022, Defendants Medsphere Systems, Corp. ("Co-defendant Medsphere") and Cantata Health, LLC. ("Co-defendant Cantata") (collectively "Defendants") removed the case to this Court based on diversity jurisdiction.  (Docket No. 1).

Before the Court now is Defendants' Joint Motion to Dismiss and Compel Arbitration ("Motion to Compel Arbitration"), pursuant to Federal Rules of Civil Procedure 12(b)(1), (3), and (6).  (Docket No. 6).

For the reasons stated below, Defendants' Motion to Compel Arbitration is GRANTED.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

**A. Factual Background.**

Plaintiff CCPR is, in its own words, "a public corporation with independent and separate personality from any other agency or instrumentality of the Government of Puerto Rico." (Docket No. 1, Exhibit 6 at p. 2). Co-defendants Cantata and Medsphere are both corporations created under the laws of Delaware. Id. Cantata provides software programs to hospitals to administrate finances and electronic health records. Id. Medsphere similarly provides electronic health record software as well as other related products and services to hospitals, clinics, and physicians. Id.

On or around December 8, 2006, Plaintiff and Co-defendant Cantata, "through its predecessor-in-interest Keane", entered into a service contract ("General Agreement"), whereby Co-defendant Cantata provided CCPRC with its software. (Docket No. 6 at p. 2).

On or around August 15, 2019, Co-defendants Cantata and Medsphere entered into an agreement with each other ("Reseller Agreement") "whereby Medsphere granted Cantata a limited, non-exclusive, non-transferable license to re-sell its applications on a stand-alone basis to a single use: CCPRC." Id. at pp. 2-3. "The Reseller Agreement attaches and incorporates a Master License and Subscription Agreement ("License Agreement")." Id. at p. 3. Section thirteen (13), subsection 1.1 of the License Agreement contains the following arbitration clause ("Section 13"):

> 13. DISPUTE RESOLUTION. If a dispute arises regarding either party's
> performance under the terms of this Agreement, the disputing party agrees
> to notify the other party in writing, detailing the nature of the dispute,
> within ten (10) days after the dispute arises. The parties agree to use their

---

[1] In CCPR's Opposition to Defendants' Motion to Compel Arbitration, it states that it **does not contest** the facts that Defendants presented. (Docket No. 10 at p. 2, n.2). For this reason, the Court will take those uncontested facts as true and rule accordingly.

best efforts in a good faith attempt to resolve the dispute in accordance with the following procedure:

. . .

1.1 Step 3 – Arbitration. **This Agreement and the arbitration and all disputes determined therein shall be governed by California law (other than with respect to principles of conflicts of laws thereunder), except that issues relating to this arbitration clause and any arbitration hereunder shall be governed by the Federal Arbitration Act, Chapters 1 and 2.  All disputes arising out of or in connection with the present Agreement shall be finally settled under the Rules of Arbitration of the American Arbitration Association by one arbitrator appointed in accordance with the said Rules.  The arbitration shall be conducted in the English language.  The place of arbitration shall be San Diego County, California.   In addition to the Rules of Arbitration of the American Arbitration Association, the parties agree that the arbitration shall be conducted according to the IBA Rules of Evidence.**  Except as may be required by law, neither a party nor its representatives nor a witness nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties. Judgment on the award may be entered in any court having jurisdiction thereof.  The parties hereby waive all objection which it may have at any time to the laying of venue of any proceedings brought in such courts, waives any claim that such proceedings have been brought in an inconvenient forum and further waives the right to object with respect to such proceedings that any such court does not have jurisdiction over such party.  Notwithstanding the foregoing, either party has the right to apply to any court of competent jurisdiction for provisional relief, including pre-arbitral attachments, a temporary restraining order, temporary injunction, permanent injunction and/or order of specific performance, as may appear reasonably necessary to preserve the rights of either party and to apply to a court of competent jurisdiction with respect to disputes regarding intellectual property rights.  The application by either party to a judicial authority for such measures shall not be deemed to be an infringement or a waiver of the arbitration agreement and shall not affect the relevant powers reserved to the arbitrator.

Id. at pp. 3-4; (Docket No. 1, Exhibit 9 at pp. 11-12) (emphasis added).

A few months later, on or around December 20, 2019, Plaintiff and Co-defendant

Cantata signed an amendment to the General Agreement between them ("Amended

Agreement"), which incorporated Medsphere software into the General Agreement, gave CCPRC authorized use of said software, and bound CCPRC to the License Agreement between Co-defendants Medsphere and Cantata, which contains Section 13. (Docket No. 6 at p. 4). Both Plaintiff and Co-defendant Medsphere signed the attached copy of the License Agreement that was incorporated into the Amended Agreement. Id.

On February 25, 2022, Plaintiff notified Defendants of its intention to terminate the License Agreement. Id. at p. 5; (Docket No. 1, Exhibit 6 at p. 7). Defendants, in response, challenged Plaintiff's notice to terminate. (Docket No. 6 at p. 5).

**B. Procedural Background.**

On July 26, 2022, Plaintiff filed a Complaint in the Puerto Rico Court of First Instance, which it subsequently amended on August 3, 2022. (Docket No. 1, Exhibit 6). Defendants filed a timely Notice of Removal on September 2, 2022 (Docket No. 1), and shortly thereafter filed the Motion to Compel Arbitration that is currently before the Court. (Docket No. 6). Plaintiff opposed Defendants' Motion to Compel Arbitration on October 10, 2022, challenging the validity of the Amended Agreement as well as the arbitration clause. (Docket No. 10). It contends that the Amended Agreement fails to meet the state law requirements needed for a contract between private and government entities to be perfected, thereby making both the Amended Agreement and Section 13, null and void. (Docket No. 10 at pp. 4-5). On October 18, 2022, Defendants filed a Reply to Plaintiff's Opposition (Docket No. 15), and Plaintiff filed its Sur-reply on November 11, 2022. (Docket No. 21).[2]

---

[2] The Court recognizes that Defendants' Supplemental Motions (Docket Nos. 26 and 28) are also pending. However, due to the Court's ruling in this Opinion and Order, Defendants' Supplemental Motions will become moot.

## LEGAL STANDARD

**A.  Summary Judgment Standard.**

The Court of Appeals for the First Circuit recently held that "district courts should apply the summary judgment standard" in cases regarding motions to compel arbitration because said standard "better aligns with the FAA's command to evaluate whether the moving party has met its burden of demonstrating that an agreement to arbitrate is not 'in issue' than Federal Rule of Civil Procedure 12's plausibility standard." Rodríguez-Rivera v. Allscripts Healthcare Solutions, Inc., 43 F.4th 150, 168 (citing Air-Con, Inc. v. Daikin Applied Latin America, LLC, 21 F.4th 168, 174-175 (1st Cir. 2021). Defendants presented their Motion to Compel Arbitration pursuant to the Federal Arbitration Act and various subsections of Federal Rule of Civil Procedure 12.  Therefore, due to the recent First Circuit's holding, the summary judgment standard will guide the Court's solution of the case.

Pursuant to Fed. R. Civ. P. 56 "[a] party may move for summary judgment, identifying each claim or defense -or the part of each claim or defense- on which summary judgment is sought." Fed. R. Civ. P. 56 (a).  Summary judgment should only be considered by the Court when the moving party proves two things: (1) that "there is no genuine issue of material fact" and (2) that they are "entitled to judgment as a matter of law." Tolan v. Cotton, 572 U.S. 650, 656-57, 134 S.Ct. 1861 (2014); Fed. R. Civ. P. 56.

Although the Court must view the record in the light most favorable to the nonmoving party and "draw[] all reasonable inferences in [their] favor", Taite v. Bridgewater State Univ., Bd. of Tr., 999 F.3d 86, 92 (1st Cir. 2021) (citing Gerald v. Univ. of P.R., 707 F.3d 1, 7 (16 (1st Cir. 2013)), the nonmoving party must still prove material

issues of fact exist that defeat summary judgment. See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52-53 (1st Cir. 2000) ("[T]he nonmoving party 'may not rest upon the mere allegations or denials of [the] pleading but must set forth specific facts showing that there is a genuine issue' of material fact as to each issue upon which he or she would bear the ultimate burden of proof at trial." (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505 (1986)).[3]

The Court must then "determine whether a trial-worthy issue exists" by "look[ing] to all of the record materials on file, including the pleadings, depositions, and affidavits." Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014) (citing Fed. R. Civ. P. 56(c)(1)(A); Johnson v. Univ. of P.R., 714 F.3d 48, 52 (1st Cir. 2013)). See also López-Hernández v. Terumo Puerto Rico LLC, No. 21-1363, 2023 WL 2706200, at *3 (D.P.R. Mar. 30, 2023) ("At summary judgment, 'the judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" (citing Anderson, 477 U.S. at 249)). Accordingly, summary judgment will not proceed if the Court deems the evidence "sufficiently openended [sic] to permit a rational fact finder to resolve the issue in favor of either side." Ahmed, 752 F.3d at 495 (citing Gerald, 707 F.3d at 16).

**B. Arbitration Standard.**

In 1925, the Federal Arbitration Act was enacted by Congress "'to overcome centuries of judicial hostility to arbitration agreements.'" Bercovitch v. Baldwin School,

---

[3] See also Nieves-Romero v. United States, 715 F.3d 375, 378 (1st. Cir. 2013) ("'[C]onclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less significantly probative' will not suffice to ward off a properly supported summary judgment motion." (citing Rogan v. City of Boston, 267 F.3d 24, 27 (1st Cir. 2001)).

Inc, 133 F.3d 41, 148 (1st Cir. 1998) (citing Dean Witter Reynolds, Inc. v. Byrd, 470 U.S.

213, 219-21, & n. 6, 105 S.Ct. 1238, 1241-43, and n. 6 (1985)).

Section 2 of the Federal Arbitration Act states:

 [A] contract evidencing a transaction involving commerce to settle by
arbitration a controversy thereafter arising out of such contract or
transaction, or the refusal to perform the whole or any part thereof, or an
agreement in writing to submit to arbitration an existing controversy arising
out of such a contract, transaction, or refusal, shall be valid, irrevocable, and
enforceable, save upon such grounds as exist at law or in equity for the
revocation of any contract. . . .

9 U.S.C.A. § 2.

Additionally, Section 3 allows the courts to stay judicial proceedings when there is

a written agreement to arbitrate the issue, whereas Section 4 allows a party to "petition

the court" the compel another to arbitrate an issue for which there is a written arbitration

agreement that said party has refused to entertain.  See 9 U.S.C.A. §§ 3-4.

The Federal Arbitration Act replaced the courts' negative view towards arbitration

with a "'national policy favoring [it] and plac[ing] arbitration agreements on equal footing

with all other contracts.'" Barbosa v. Midland Credit Management, Inc., 981 F.3d 82, 86

(1st Cir. 2020) (citing Nat'l Fed'n of the Blind v. The Container Store, Inc., 904 F.3d 70,

79 (1st Cir. 2018)). As such, the statute promotes a strong "'liberal federal policy favoring

arbitration'", as well as "'the fundamental principle that arbitration is a matter of

contract.'" AT&T Mobility LLC v. Concepción, 563 U.S. 333, 339, 131 S.Ct. 1740, 1745

(2011) (citing Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 24,

103 S.Ct. 927 (1983); Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 67, 130 S.Ct. 2772,

2776 (2010)).  This means that "courts can invalidate arbitration agreements only on the

same 'generally applicable contract defense []' grounds that would apply to all other

contracts." Rivera-Colón v. AT&T Mobility Puerto Rico, Inc., 913 F.3d 200, 207 (1st Cir. 2009) (citing Doctor's Assocs. v. Casarotto, 517 U.S. 681, 687, 116 S.Ct. 1652 (1996)).

However, the Federal Arbitration Act cannot compel parties to arbitrate an issue they have not agreed to arbitrate. Rodríguez-Rivera, 43 F.4th at 167-68 (citing Rivera-Colón, 913 F.3d at 207). Therefore, "to trigger the FAA's protective reach, the existence of a valid and enforceable agreement to arbitrate between the parties must be identified." Id. at 168 (citing Nat'l Fed. of the Blind, 904 F.3d at 80).

## LEGAL ANALYSIS

### A. Validity Challenge.

The crux of Plaintiff's Opposition to Defendants' Motion to Compel is that the Amended Agreement and the arbitration clause contained therein are invalid. (Docket No. 10). Defendants, as the parties seeking to compel arbitration in this case, have the burden of proving that a valid agreement to arbitrate exists. Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 6 (1st Cir. 2014) (citing Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011)). The Court must therefore lay out the proper legal framework.

The First Circuit has repeatedly held that when a party looks to compel arbitration pursuant to the Federal Arbitration Act, it must show the following: (1) "that a valid agreement to arbitrate exists"; (2) "that the movant is entitled to invoke the arbitration clause"; (3) "that the other party is bound by that clause; and (4) "that the claim asserted comes within the clause's scope." Dialysis Access Center, LLC v. RMS Lifeline, Inc., 638 F.3d 367, 375 (1st Cir. 2011) (citing InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003)). See also Soto v. State Industrial Products, Inc., 642 F.3d 67, 72 (1st Cir. 2011);

Grand Wireless, Inc., 748 F.3d at 6; Nat'l Fed. of the Blind, 904 F.3d at 80; McKenzie v. Brannan, 19 F.4th 8, 15 (1st Cir. 2021).

As the First Circuit stated in Nat'l Fed. of the Blind, "there's an important distinction between arguments challenging the validity of an agreement and those challenging an agreement's formation." 904 F.3d at 80 (citing Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 444, n.1 126 S.Ct. 1204 (1967); Rent-A-Center, 561 U.S. at 70, n.2). Plaintiff claims he is presenting the first kind of challenge, a validity challenge. These kinds of challenges, however, can also be divided into two types: "(1) challenges to the validity of an entire contract which contains an arbitration clause, and (2) challenges to the validity of the specific agreement to resolve the dispute through arbitration." Farnsworth v. Towboat Nantucket Sound, Inc., 790 F.3d 90, 96 (1st Cir. 2015) (citing Rent-A-Center, 561 U.S. at 70; Buckeye Check, 546 U.S. at 444).

Citing Supreme Court precedent, the Farnsworth court recognized that "challenges of the first type are for the arbitrator to decide, whereas challenges of the second type are for the courts to decide, if timely and properly made." Id. (citing Rent-A-Center, 561 U.S. at 70; Buckeye Check, 546 U.S. at 444-45; Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395, 402-04, 87 S.Ct. 1801 (1967); and Dialysis Access Ctr., LLC, 638 F.3d at 376-77, 383). To this end, this Court, following Supreme Court precedent, has previously explained that in cases where "the validity of the entire contract is challenged[,] the arbitration clause becomes *severable* from the remained [sic] of the contract and is enforced." Pérez v. UBS Financial Services Inc., Civil No. 15-3081 (GAG), 2016 WL 5462808, at *8 (D.P.R. Sept. 29, 2016) (Gelpí, J.). On the other hand, a challenge of the second type requires the Court to apply the state's contract law. See

Rivera-Colón, 913 F.3d at 207 ("Because arbitration is a creature of contract, 'principles of state contract law control the determination of whether a valid agreement to arbitrate exists.'" (citing Soto-Fonalledas, 640 F.3d at 475)).

**B. Discussion.**

Defendants contend that this case should be referred to arbitration as per the terms stated in Section 13 of the License Agreement, which was incorporated into the Amended Agreement.  (Docket No. 10).  They also aver that, although Plaintiff claims to challenge the validity of Section 13 specifically, Plaintiff's arguments challenge the validity of the Amended Agreement as a whole.  (Docket No. 15 at p. 3).  Plaintiff opposes Defendants' contention and insists that its validity challenge is targeted specifically to Section 13. (Docket No. 21 at p. 2).  The Court agrees with Defendants.

Despite Plaintiff's claim that it is challenging Section 13 specifically, its arguments have consistently been that Section 13 is invalid because the Amended Agreement lacks the mandatory clauses that Puerto Rico contract law requires for valid contractual relationships between private and Government entities.[4]  (Docket Nos. 10 and 21).  This is the type of argument that falls squarely within the first type of validity challenge, which the Supreme Court has repeatedly stated is an argument for the arbitrator, not the court, to determine.  See e.g., Buckeye Check, 546 U.S. at 449 ("We reaffirm today that, regardless of whether the challenge is brought in federal or state court, a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator."); Rent-A-Center, 561 U.S. at 70 ("[A] party's challenge to another

---

[4] P.R. Laws Ann. tit. 3, § 8615.

provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate." (citation omitted)).[5] Thus, the law states that the Court has no choice but to refer this case to arbitration.

However, even if the Court were to only analyze the validity of Section 13, it would still rule in favor of arbitration. As previously mentioned, state law governs when deciding whether an arbitration clause is valid. Accordingly, Puerto Rico's contract law would determine the validity of the arbitration agreement in the instant case. State Indus. Products, Inc., 642 F.3d at 72. Pursuant to Puerto Rico's contract law, a valid contract requires three elements, to wit: "(1) [t]he consent of the contracting parties; (2) [a] definite object which may be the subject of the contract; and (3) [t]he cause for the obligation which may be established." Id. at p. 73 (citing P.R. Laws Ann. tit. 31, § 3391). If one of these elements is lacking, such as consent of one of the parties, the contract would be deemed null and void, as if it never existed. Dialysis Access Ctr., LLC, 638 F.3d at 378 (citing Lummus Co. v. Commonwealth Oil Refining Co., 280 F.2d 915, 930 n. 21 (1st Cir. 1960)). However, if all these requirements are met, then the contract is enforceable under Puerto Rico law, and the Court is consequently obliged to refer the parties to arbitration as per the arbitration agreement. Id.[6] See also Byrd, 470 U.S. at 218 ("[A]greements to

---

[5] See, for example, Francisco J. Ortiz & Co., Inc. v. Masco Corp. of Indiana, 147 F.Supp.3d 1, 4 (D.P.R. 2015) (Besosa, J.) (citing Buckeye, 546 U.S. at 448-49), where the Court also found that the validity challenge was as to the whole contract and not to the specific arbitration clause, and explained that:

> The United States Supreme Court recognized that this rule may seem harsh in that it 'permits a court to enforce an arbitration agreement in a contract that the arbitrator later finds to be void,' but the court nonetheless reaffirmed that 'a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator.'

[6] It should be noted that the Puerto Rico Supreme Court also promotes a strong pro-arbitration policy and has likewise found that "the validity of a contract is an issue that may be brought to the consideration of an arbitrator under the severability doctrine." S.L.G. Mendez-Acevedo v. Nieves Rivera, 179 P.R.Dec. 359, 390 (2010) (Court's translation). Citing Buckeye Check, 546 U.S. at 444, the Puerto Rico Supreme Court determined that an "attempt to present the

arbitrate must be enforced, absent a ground for revocation of the contractual agreement.").

Upon reviewing Section 13 of the License Agreement incorporated to the Amended Agreement, the Court finds that all elements for a valid contract are present. Moreover, Plaintiff fails to argue that these elements are lacking or vitiated in any way, but instead limits itself time and again to challenging the Amended Agreement's validity, which is proper for the arbitrator to decide and not the Court. (Docket Nos. 10 and 21).[7] As a result, the Court finds that the arbitration clause is valid and therefore enforceable.

As to the other three factors required to grant a motion to compel arbitration,[8] the Court reminds Plaintiff that in its Opposition, it did not contest any of the facts included in Defendants' Motion to Compel Arbitration. (Docket No. 10 at p.2, n.2). This includes the fact that the Amended Agreement clearly states that, upon signing, Plaintiff was bound by the License Agreement incorporated within Amended Agreement. (Docket No. 6 at p. 4). The Court, therefore, take this fact as true for purposes of this Opinion and Order, and concludes that factors two and three are met. Furthermore, the Court finds that the broad scope of Section 13's language encompasses the issues currently before the Court. See Dialysis Access Ctr., LLC, 638 F.3d at 381 (holding that an arbitration clause

---

concepts of 'validity' vis-à-vis 'existence' as dichotomous, in order to avoid arbitration, lacks merit" and held that such an issue is "a matter for the arbitrator to decide, not for the courts." Id. (Court's translation).

[7] See, Soto-Alvarez v. American Inv. and Management Co. (AIMCO), 561 F.Supp.2d 228, 231 (D.P.R. 2008) (Pieras, J.) ("The evidence in the record shows that the arbitration agreement between the parties is a valid contractual obligation under Puerto Rico law, and Plaintiff has presented no arguments to the contrary.").

[8] Having found that the first factor is met since there is a valid agreement to arbitrate, the subsequent discussion refers to the remaining factors on the list.

with similar language to the one in this case was broad enough to presume arbitrability).

Thus, the Court is obligated to compel arbitration.

In view of the above, Defendants' Motion to Compel Arbitration is GRANTED, and the parties are referred to arbitration.

## CONCLUSION

For the foregoing reasons, Defendants' Joint Motion to Dismiss and to Compel Arbitration is GRANTED (Docket No. 6).  Accordingly, this case is DISMISSED without prejudice, and the parties are ORDERED to binding arbitration pursuant to the rules of the American Arbitration Association in the jurisdiction applicable by Defendant, as per the terms set forth in the Amended Agreement.

In addition, Defendants' Supplemental Motions (Docket Nos. 26 and 28) are deemed moot.

IT IS SO ORDERED.

Judgment is to be entered accordingly.

In San Juan, Puerto Rico, on this 12th day of April 2023.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ-RIVE
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

CORPORACIÓN DEL CENTRO
CARDIOVASCULAR DE PUERTO RICO
Y EL CARIBE,

Plaintiff,

v.

MEDSHERE SYSTEMS CORP., et al.,

Defendants.

CIVIL NO. 22-1425 (CVR)

## JUDGMENT

Pursuant to the "Motion to Compel Arbitration" (Docket No. 6) and the Court's Order of this same date (Docket No. 38), the Court hereby ENTERS JUDGMENT, and DISMISSES WITHOUT PREJUDICE this case. The parties are ORDERED to binding arbitration pursuant to the rules of the American Arbitration Association in the jurisdiction applicable by Defendant, as per the terms set forth in the Amended Agreement.

IT IS SO ORDERED AND ADJUDGED.

In San Juan, Puerto Rico, on this 12th day of April 2023.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ RIVE
UNITED STATES DISTRICT JUDGE

014

| Date | # | Description |
|------|---|-------------|
| 03/24/2023 | 37 | ORDER: granting Docket No. 36 Motion for extension of time to file response. Opposition to Second Supplemental Motion due on or before April 23, 2023. Signed by Judge Camille L. Velez-Rive on March 24, 2023. (ASE) (Entered: 03/24/2023) |
| 04/12/2023 | 38 | OPINION AND ORDER granting 6 MOTION to Compel Arbitration. This case is DISMISSED without prejudice, and the parties are ORDERED to binding arbitration pursuant to the rules of the American Arbitration Association in the jurisdiction applicable by Defendant, as per the terms set forth in the Amended Agreement. Signed by Judge Camille L. Velez-Rive on 4/12/2023. (ari) (Entered: 04/12/2023) |
| 04/12/2023 | 39 | ORDER finding as moot 26 Supplemental Motion in Support of Arbitration and 28 Second Supplemental Motion re: 27 Memorandum in Opposition. Signed by Judge Camille L. Velez-Rive on 4/12/2023. (ari) (Entered: 04/12/2023) |
| 04/12/2023 | 40 | JUDGMENT. This case is DISMISSED without prejudice, and the parties are ORDERED to binding arbitration pursuant to the rules of the American Arbitration Association in the jurisdiction applicable by Defendant, as per the terms set forth in the Amended Agreement. Signed by Judge Camille L. Velez-Rive on 4/12/2023.(ari) (Entered: 04/12/2023) |
| 04/20/2023 | 41 | MOTION for Reconsideration re 38 Order on Motion to Compel, 40 Judgment, filed by Eliezer Alberto Aldarondo-Lopez on behalf of Corporacion del Centro Cardiovascular de Puerto Rico y del Caribe Responses due by 5/4/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Related document(s) 38 , 40 ) (Aldarondo-Lopez, Eliezer) (Entered: 04/20/2023) |
| 04/26/2023 | 42 | BILL OF COSTS *$402.00 Filing Fee Receipt No. APRDC-7901645* by Cantata Health, LLC, Medsphere Systems Corp.. (Van-Derdys, Fernando) (Entered: 04/26/2023) |
| 04/26/2023 | 43 | RESPONSE to Motion *for Reconsideration* filed by Cantata Health, LLC, Medsphere Systems Corp. Re: 41 MOTION for Reconsideration re 38 Order on Motion to Compel, 40 Judgment, filed by Corporacion del Centro Cardiovascular de Puerto Rico y del Caribe filed by Cantata Health, LLC, Medsphere Systems Corp.. (Van-Derdys, Fernando) Modified on 4/27/2023 to edit docket text (ab). (Entered: 04/26/2023) |
| 04/26/2023 | 44 | ORDER: Denying Docket No. 41 Motion for Reconsideration filed by Corporacion del Centro Cardiovascular de Puerto Rico y del Caribe, for the reasons set forth in Defendants' Opposition at Docket No. 43 . Signed by Judge Camille L. Velez-Rive on 4/26/2023. (JV) (mcm). (Entered: 04/26/2023) |
| 04/26/2023 | 45 | ORDER: re Docket No. 42 Bill of Costs filed by Medsphere Systems Corp., Cantata Health, LLC. The Bill of Costs is hereby referred to the Clerk of Court for disposition. Signed by Judge Camille L. Velez-Rive on 4/26/2023. (JV) (Entered: 04/26/2023) |
| 05/02/2023 | 46 | NOTICE OF APPEAL as to 40 Judgment, 44 Order on Motion for Reconsideration, 38 Order on Motion to Compel, by Corporacion del Centro Cardiovascular de Puerto Rico y del Caribe. Filing fee $505, receipt number APRDC-8198337.<br><br>**NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf** (Attachments: # 1 Exhibit 1 (Judgment), # 2 Exhibit 2 (Opinion and Order))(Aldarondo-Lopez, Eliezer) (Entered: 05/02/2023) |
| 05/11/2023 | 47 | Certified and Transmitted Record on Appeal to US Court of Appeals re 46 Notice of Appeal [Docket Entries 38, 40, 44 & 46] (mcm) (Entered: 05/11/2023) |

175 D.P.R. 994, 2009 WL 1456730 (P.R.,) 2009 TSPR 77

Quest Diagnostics of
Puerto Rico, Inc., respondent,

v.

Municipality of San Juan and Hon. Jorge
Santini, in his capacity as the Mayor of the
Municipality of San Juan, petitioners.

In the Puerto Rico Supreme Court.
*Number:* CC-2007-565

**Synopsis**

*Certiorari* requesting the reversal of a judgment issued by the Court of Appeals affirming the decision of the Court of First Instance, which granted a complaint for collection of money against the Municipality of San Juan through summary judgment. *The judgmentat issue entered by the Court of Appeals is hereby reversed. The motion for summary judgment filed by the Municipality is hereby granted and judgment is entered as requested, dismissing the captioned complaint.*

Associate Justice Mr. Rivera Pérez issued the opinion of the Court.

In this petition, we are asked to reverse a judgment entered by the Court of Appeals affirming a decision of the Court of First Instance. The primary forum granted, through summary judgment, a complaint for collection of money for the amount of $283,063.15 against the Municipality of San Juan.

**I**

On February 16, 2000, the Municipality of San Juan (Municipality) conducted a bidding process to acquire reference laboratory services for its Health Centers run by the Department of Health. Las Marías Reference Lab. (Las Marías) was awarded the bid. On March 27, 2000, the Municipality and Las Marías executed a contract for said services for a period of two years, with an expiration date of March 27, 2002.

Section (10) of the referenced contract provides the following:

The analysis of the bidder's financial and moral soundness *is an essential element for the awarding of this bid*; it is therefore expressly prohibited for the winning bidder to *transfer, grant, sell, assign,* or otherwise convey the rights and duties, including any credits, that the bidder or contractor may acquire in its favor by means of this contract –in other words, the assignment of credits, any industrial and/or commercial repair agreement, among others– to any natural person or legal entity *without the previous written consent of the Bidding Board.* When submitting a signed bid, the bidder guarantees **\*998** that it has a sound financial position and excellent credit. (Emphasis ours.)

On December 26, 2001, with the contract in full force and effect, Quest Diagnostics of Puerto Rico, Inc. (Quest) acquired several assets from Las Marías, including the above-mentioned contract. Las Marías did not request or obtain the Municipality's consent to said transfer. Additionally, the contract was not amended in any way to substitute Quest for Las Marías.

On October 8, 2002, and after the original contract had expired, the supervisor of the purchases and bids section of the Municipality's Department of Health requested, by letter, that the contract be extended until December 31, 2002. The contract was likewise extended on four occasions –until July 2003– more than one year after the original contract had expired. On the last two occasions, the employees of the Municipality expressed that the requested extensions had been approved by the Bidding Board in meetings held for that purpose. However, there is no evidence of such agreements.

On February 18, 2004, Quest filed a legal action for collection of money against the Municipality for the amount of $283,063.15. The Municipality then filed a motion for summary judgment. The primary forum determined that the letters to extend the contract constituted implied consent by the Municipality. In addition, it granted the motion for summary judgment in favor of Quest and ordered the Municipality to pay the $283,063.15. Its decision was based on an amendment to the applicable rules that allows for the rectification of the failure to execute a written contract. The Municipality filed a timely requst for review with the Court of Appeals, which affirmed the judgment issued by the primary forum.

Not satisfied with said determination, the Municipality appeared before us and pointed to the following errors: **\*999**

*The Court of Appeals erred in affirming the judgment entered by the Court of Instance and concluding that legal obligations were created between Quest and the Municipality of San Juan in light of the assignment or transfer of the contract with Las Marías Reference Lab., even though Quest never executed any written contract with the Municipality.*

**WESTLAW** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

*The Court of Appeals erred in affirming the judgment entered by the Court of Instance and concluding that the contract between Las Marías Reference Lab. and the Municipality of San Juan was validly extended through letters signed by municipal employees who do not have the legal authority to sign contracts on behalf of the Municipality.*

With the parties' briefs duly submitted, we proceed to issue a ruling.

## II.

The core issue to be decided is whether the assignment and extension of the contract in question bind the Municipality to the terms set forth therein. We believe they do not.

**[1]** A. The Civil Code establishes the obligatory nature of the legal relationships created through contracts.[1] For its part, Art. 1213 demands that, for a valid contractual relationship to exist, the essential elements of consent and cause must concur.[2] Art. 1214 provides that consent is expressed by the concurrence of the offer and acceptance of the thing and the cause which are to constitute the contract.[3] *[Official translation]*

**[2]** These requirements are essential, meaning that their absence prevents the existence of the contract.[4] Consent comprises "two fundamental and very different aspects: the ability to consent and the **\*1000** giving of the consent."[5] Art. 1216 of our Civil Code recognizes the potential restrictions on the ability to consent that can be established by law.[6] This provision comprises the legal prohibitions affecting specific persons regardless of their strictly personal conditions.[7] This legal precept refers to contracting parties "who are legally barred from giving their consent in specific cases for reasons of morality or convenience."[8]

**[3]** To these effects, through special statutes, the lawmaker has imposed requisites and conditions on the execution of contracts with the municipalities. The validity of contracts executed with government entities is examined in accordance with the special statutes, instead of resorting to general contract law theories. *Mun. de Ponce v. A.C. et al.*, 153 D.P.R. 1 (2000).

**[4]** Public Law No. 81 of August 30, 1991, better known as the Autonomous Municipalities Act of the Commonwealth of Puerto Rico (Autonomous Municipalities Act,) sets forth a series of requirements for the awarding of bids and the subsequent contracting with the municipalities.[9] Said Act delegates on the Bidding Board the duty to evaluate and award all the bids required by law. All of the agreements and resolutions of the Board must be approved by the majority of its members, except as otherwise provided.[10]

**[5]** When contracting with the municipalities, the written contract or agreement must be sent to the Office of the Controller, except for specific exeptions, and it must be **\*1001** time stamped. *Ocasio v. Alcalde Mun. de Maunabo*, 121 D.P.R. 37 (1988). Public Law No. 127 of May 31, 2004, amended Public Law No. 18 of October 30, 1975 (Act 18) to provide that a municipal contract or agreement shall not be declared null and void *merely because it was not registered with or sent to the Office of the Comptroller.*[11] This amendment did not alter the public policy sought by the other requirements established by law and case authority, since it is still necessary and essential for a contract to be valid for it to be executed and set forth in writing. *Cordero Vélez v. Mun. de Guánica*, 170 D.P.R. 237 (2007); *Colón Colón v. Mun. de Arecibo*, 170 D.P.R. 718 (2007). The requirement of a written contract is a formal or substantive one, and it serves as a mechanism to avoid fraudulent and unlwaful payments and claims. *Colón Colón v. Mun. de Arecibo*, supra.

In *Las Marías v. Municipio San Juan*, 159 D.P.R. 868, 878 (2003), because of the reliance on written letters to renew contractual relationships with the Municipality, the contracts were declared null and void. Said case was examined prior to the amendment of Act 18, *supra*, and was thus decided without the registration of the contracts at issue.

The standard established in *Fernández & Gutiérrez v. Mun. de San Juan*, 147 D.P.R. 824, (1999), is in effect and has not been affected by the amendment of Act 18, *supra*. On that occassion, the plaintiff claimed payment of lease amounts owed by the Municipality. The parties had validly executed a lease agreement that expired. It was alleged that the agreement had been extended by means of letters sent by the Municipality to the plaintiff. Without having to decide whether the referenced letters reflected the unconditional commitment to contract, we concluded that the Municipality was not bound to comply with the extension. We based our decision on the fact that the letters were not prepared by the Mayor or by a person designated by him **\*1002** to assume obligations on behalf of the Municipality. We also held that even if the letters had been prepared by a person authorized by law,  they were not binding on the Municipality, since the commitment was not recorded in the form of a written contract.

**[6]** Art. 3.009 of the Autonomous Municipalities Act bestows on the Mayor the authority and duty to represent the Municipality and to delegate, in writing, the duties assigned to him or her by said law on another employee.[12]

[7] These legal precepts and their intrepretive jurisprudence seek to promote efficiency, honesty, and correctness with the aim of protecting the interests of the people. *Cordero Vélez v. Mun. de Guánica*, supra. The established principle provides that, in order to commit public funds, the procedures established by law must be followed, thus promoting a sound and honest public administration. *Cordero Vélez v. Mun. de Guánica*, supra. The courts are called upon to enforce the legal provisions aimed at protecting public disbursements, as they protect the public interest instead of that of the contracting parties. *Hatton v. Mun. de Ponce*, 134 D.P.R. 1001 (1994).

[8] We have repeatedly stated that private entities have the duty to ensure compliance with the law when contracting with the municipalities, or they risk being held liable for their losses. *Colón Colón v. Mun. de Arecibo*, supra. We have thus determined the inapplicability of any equitable relief for the damages suffered as a result of the failure to adhere to the established rules. *Las Marías v. Municipio San Juan*, supra.

[9] B. Rule 36.2 of the Rules of Civil Procedure is the appropriate procedural mechanism to request summary judgment.[13] It is an extraordinary mechanism that applies only in cases that do not require holding **\*1003** trial in order for a decision to be issued. *González Aristud v. Hosp. Pavía*, 168 D.P.R. 127 (2006). The party filing said request must clearly establish its right to do so and show that there is no genuine issue of material fact. Id. The party opposing said request must dispute the evidence presented and must not sit on its hands, or it will risk an adverse decision. *Luan Invest. Corp. v. Rexach Const. Co.*, 152 D.P.R. 652 (2000). However, the mere fact that the respondent does not oppose does not necessarily imply that summary judgment is warranted; it must be warranted according to law. *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714 (1986).

[10] When evaluating a motion for summary judgment, all the pleadings contained in the case docket, as well as any interrogatories, admissions, and sworn statements must be considered, and it must be confirmed that there is no genuine issue of material fact. *Corp. Presiding Bishop CJC of LDS v. Purcell*, supra. Any question about the existence of an issue pertinent and material facts must be resolved against the party moving for summary judgment. *Mgmt. Adm. Servs. Corp. v. E.L.A.*, 152 D.P.R. 599 (2000). This mechanism must not be used in very complex cases or in cases involving the public interest. *González Aristud v. Hosp. Pavía*, supra.

## III

With the benefit of the aforestated Law, we now proceed to review the controversy before us. The Court of Appeals affirmed the primary forum and held that the Municipality was aware of the transfer of the contract to Quest, for which reason the assignment and extension of said contract was valid. Additionally, it affirmed the findings of the forum *a quo* to the effect that the law allows contracts and agreements that are not set in writing to be rectifiable and regarding the Municipality's implied consent to extending the contract. We believe that it erred in doing so. **\*1004**

A. The Municipality alleges that a contract never existed between it and Quest. Additionally, it argues that the contract that it executed with Las Marías was not validly transferred to Quest for it to be binding on the Municipality.

For its part, Quest supports its contention on general principles of contract law, without considering the special regulations that were not observed and which seek to promote the appropriate oversight of public expenses. In its brief, Quest states that "the letters extending the term of the agreement, the request for additional services, and the admissions of municipal employees unequivocally demonstrate the Municipality's consent to said assignment".[14]

Quest maintains that our pronouncements in *Cordero Vélez v. Mun. de Guánica*, supra, are inapplicable, inasmuch as no contract or agreement ever existed in those events. It states that the letters sent by the supervisor of the Purchases and Bids Division, the assistant director for Purchases and Supplies, and the acting manager of the Office of the Municipality were sufficient to consent to the assignment and to extend the agreement. Section (10) of the agreement executed with Las Marías expressly prohibited the assignment of the agreement except with the *previous written consent of the Bidding Board*. Our expressions in *Cordero Vélez v. Mun. de Guánica*, supra, apply, inasmuch as they relate to the consent of the Bidding Board. Public Law No. 81, *supra,* provides the way in which the Board issues its resolutions and agreements. Quest relies on a letter sent to all the clients of Las Marías informing them about the assigment. The reason for demanding previous approval by the Board is to ensure that the persons that provide services to the municipalites  are vetted and meet the requirements of law. Quest has not shown that it obtained the previous written consent of the Board for the referenced assignment; therefore, the assignment is not binding on the Municipality. **\*1005**

B. Quest argues in its defense that the Municipality's implied consent to contract can be deduced from its conduct.

It forgets, once again, that the general principles of contract law are not enough in this type of contracting when the requirements imposed by the applicable special laws are not met.

The letters to extend the contract were signed by municipal employees who were not authorized by law to enter into commitments on behalf of the Municipality, for which reason the Municipality is not bound by same.[15] Furthermore, the letters to extend the effective term of the legal relationship between the parties cannot be considered a contract between said parties, since said letters do not comply with the legal requirements to constitute a written contract that is binding on the Municipality.

The amendment to Public Law No. 18, *supra*, does not change the result stated herein, since the amendment only deals with the sending of the contract to the Office of the Comptroller, and the essential requirement of executing a written contract still stands. Holding otherwise would open the door to unlawful acts in detriment to public funds. Ordering the Municipality to comply with an ineffective contract that does not conofrm to the law is unwarranted. Adhesion to the established rules and regulations is essential to a sound administration.

Quest knew or should have known that the letters that were sent to the Municipality to extend the agreement were ineffective and in no way binding on the Municipality. The private parties that contract with the Government must ensure strict compliance with the laws or else they risk suffering economic losses due to their carelessness.

[11] Once again, we firmly discourage the violation of the law and the actions of the employees of the Municipality. It is the duty of every municipality to ensure that all **\*1006** its employees abide by the procedures established in the Autonomous Municipalities Act. Furthermore, "[a] good government administration is a virtue of democracy, and part of a good administration entails carrying out its duties as purchaser efficiently, honestly, and correctly, in order to protect the people's interests and moneys..." *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, 126 D.P.R. 864, 871 (1990).

There being no genuine issue of material fact, we must enter summary judgment dismissing the claim against the Municipality.

### IV

On the grounds stated hereinabove, *the judgment at issue entered by the Court of Appeals is hereby reversed. The motion for summary judgment filed by the Municipality is hereby granted and judgment is entered as requested dismissing the captioned complaint.*

Associate Justice Ms. Rodríguez Rodríguez concurred with the result without issuing a written opinion.

Footnotes

1    31 L.P.R.A. sec. 2994.

2    31 L.P.R.A. sec. 3391.

3    31 L.P.R.A. sec. 3401.

4    J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1985, T. II, Vol. 1,  at 41.

5    Puig Brutau, *op. cit.*, at 43.

6    31 L.P.R.A. sec. 3403.

7    Puig Brutau, *op. cit.*, at 44.

8    J.R. Vélez Torres, *Derecho de Contratos*, T. IV, Vol. II, 1990,  at 1.

9    21 L.P.R.A. sec. 4001 *et seq.*

10   21 L.P.R.A. sec. 4505.

11    2 L.P.R.A. sec. 97.

12    21 L.P.R.A. sec. 4109.

13    32 L.P.R.A. Ap. III.

14    Quest Brief in Opposition, at 12.

15    This is reflected in the certification of Executive Orders signed by the Mayor. Appendix to *Certiorari*, at 514.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW  © 2022 Thomson Reuters. No claim to original U.S. Government Works.  020   5

**CERTIFICATE OF TRANSLATION**
**SPANISH TO ENGLISH**

**DOCUMENT:** Opinion of the Puerto Rico Supreme Court in Case No. CC-2007-565, Quest Diagnostics of Puerto Rico, Inc. vs. Municipality of San Juan – 175 D.P.R. 994, 2009 WL 1456730 (P.R.), 2009 TSPR 77 (original Spanish document consisting of 5 pages)

The undersigned, Margot A. Acevedo Chabert, USCCI, hereby certifies that she has been actively engaged as a professional translator and interpreter (English <> Spanish) certified by the Administrative Office of the United States Courts since 2006 (Certificate No. 06-001), that she has an MA in Translation from the University of Puerto Rico, and that to the best of her knowledge and understanding, the attached document is a true and correct translation of the original text provided for translation.

In Milwaukee, WI, on October 19, 2022

**Margot A. Acevedo Chabert, USCCI**

190 D.P.R. 448, 2014 WL 997549 (P.R.), 2014 TSPR 32

Ramiro Rodríguez Ramos, et al., respondents,

v.

Commonwealth of PR, et al., petitioners.

In the Puerto Rico Supreme Court.
*Number:* CC-2013-234
*Resolved:* March 6, 2014
March 6, 2014.

1. Obligations—Creation, Existence, and Effect—Birth and Sources—Contracts.
Art. 1044 of the Civil Code, 31 LPRA sec. 2994, provides that obligations arising from contracts have legal force between the contracting parties and must be fulfilled in accordance with their stipulations. *[Official translation]* Consequently, a contract exists from the moment one or more persons consent to bind themselves, with regard to another or others, to give something or to render some service, and will be valid as long as the following requisites concur: consent, object, and cause.

2. Contracts—In General—Requirements and Validity—Parties, Proposals or Offers, and Acceptance—Offer and Acceptance—Freedom to Contract.
In our legal system, the principle of contractual autonomy allows contracting parties to establish the agreements, clauses, and conditions that they may deem convenient. However, the contract will be null and nonexistent if it is in contravention of the law, morals, or public order. In such cases, any of the contracting parties may challenge the contract, even if they have benefited from it.

3. Puerto Rico—Commonwealth—Assets, Contracts, and Responsibilities—Authority or Power of the Commonwealth to Contract.
Sec. 9 of Art. VI of our Constitution, LPRA, Volume 1, establishes that public property and funds shall only be disposed of for public purposes, for the support and operation of State institutions, and pursuant to law. *[Official translation]* To fulfill this constitutional mandate, the Legislature has enacted laws imposing fiscal and government procurement controls. Thus, a contract between a private party and the State that does not comply with these laws will be null and nonexistent.

4. Id.—Id.—Id.—In General.

The Puerto Rico Government Accounting Act establishes that all appropriations and funds authorized for the expenditures of a fiscal year shall be applied exclusively to the payment of expenses lawfully incurred during the respective year **\*449** or to the payment of obligations legally contracted and duly entered into the books of said year. *[Official translation]*

5. Id.—Id.—Id.—Id.
Art. 9(a) of the Puerto Rico Government Accounting Act, 3 LPRA sec. 283h(a), mandates that the dependencies shall order obligations and disbursements from their public funds only to pledge or pay for services, supplies, materials and equipment, and claims or other items authorized by law. The Secretary shall record the obligations and make and record the disbursements according to the documents submitted by the dependencies, which shall be previously approved as an obligation or for payment by the corresponding head of the dependency or by the official or employee the latter may designate as his/her authorized agent. *[Official translation]*

6. Id.—Id.—Id.—Authority or Power of the Commonwealth to Contract—Requirements of Contracts.
The Puerto Rico Government Accounting Act clearly states that for a contract executed by the State and a private party to be valid and enforceable, it must be in writing prior to the corresponding considerations.

7. Id.—Id.—Id.—Id.—Id.
A government contract for the provision of professional or consulting services must comply with the requirements of Public Law No. 237-2004 in order to be valid. Legal services are covered by said law's definition of the concept "professional or consulting services," namely those "whose primary purpose consists in providing intellectual, creative, or artistic products or in the management of highly technical or specialized skills." *[Official translation]*

8. Id.—Id.—Id.—Id.—Id.
Art. 2 of Law No. 237-2004 (3 LPRA sec. 8612) provides that government contracts for professional and consulting services shall be especially perfected and used solely when the government entity lacks or is unable to use the internal resources to be contracted, or when the expertise, skills, or experience of the contractor are needed to achieve the purposes for which the same is contracted. *[Official translation]* Said article also requires that, when retaining the services of a contractor, the State take into account the real need for the services to be contracted as well as the financial situation and the budget of the contracting government entity. *[Official translation]*

9. Id.—Id.—Id.—Id.—Id.

Art. 3 of Public Law No. 237-2004 (3 LPRA sec. 8613) lists a number of requirements, both formal and substantive, that any contract between the State and a contractor must fulfill. Specifically, said article requires that (1) the execution of a professional or consulting services contract between a contractor and the Government be prospective, and (2) the legal provision that authorizes the government entity to grant contracts be formalized in writing and **450** included in the text of the contract. *[Official translation]*

10. Id.—Id.—Id.—Id.—Id.

Public Law No. 237-2004 provides that any government contract for professional or consulting services, which category includes the provision of legal services, is valid only if it is reduced to writing and has prospective effect. Without a doubt, Public Law No. 237-2004 prohibits the verbal and retroactive contracting of professional and consulting services.

11. Id.—Id.—Id.—Id.—Id.

For a contract between a private entity and the State to be binding, it must be in writing. This requirement has to be met without exception.

12. Id.—Id.—Id.—Id.—Id.

Performing any work before having a written contract violates the rules of government contracting. Validating a contract retroactively would encourage corruption, as a contractor could perform the work prior to executing the written contract to pressure its future execution whether by the current administration or the next.

13. Id.—Id.—Id.—Id.—Id.

Retroactive government contracting renders any control prior to the creation of a government obligation inoperative. This practice also prevents third parties, such as the Office of the Comptroller, from complying with the public policy of the Puerto Rico Government Accounting Act and citizens from obtaining the written contract to pass judgment on the contracting, for the contract is written and published after the execution and consummation of the obligations stipulated therein.

14. Id.—Id.—Id.—Id.—Id.

Parties that contract with a government entity without fulfilling the requirements for government contracting risk having to assume responsibility for their losses. This is because the courts have consequently rejected the application of any equitable relief, such as unjust enrichment, to validate a public obligation without a written contract and thus indemnify the damages suffered by a private party because of its failure to comply with said requirements.

15. Id.—Id.—Id.—Id.—Id.

In addition to the clear requirement that the government contract be written and prospective, Art. 1 of Public Law No. 18-1975 (2 LPRA sec. 97(a) provides that government and municipal entities of the Commonwealth of Puerto Rico, with no exception whatsoever, shall keep a registry of all contracts executed, including amendments thereto, and shall remit a copy **451** thereof to the Office of the Comptroller within fifteen (15) days following the date of the execution or amendment of the contract. *[Official translation]*

16. Id.—Id.—Id.—Id.

Sound public administration requires that contracts with the Government meet the following requirements: (1) that they be reduced to writing; (2) that a faithful record be kept to establish their *prima facie* existence; (3) that a copy be sent to the Office of the Controller as further **462** evidence of its execution, terms, and existence, and (4) that they state the exact time of their execution, that is, that it be shown that they were made and executed fifteen days before.

17. Id.—Id.—Id.—Id.—Id.

Public Law No. 127-2004 amended Art. 1 of Public Law No. 18 of October 30, 1975 (2 LPRA sec. 97(a)) to clarify that the failure to comply with the requirement to register and remit a contract to the Office of the Comptroller can be remedied and does not result in the annulment of the contract. Instead, it was provided that the failure to comply with this requirement has the effect of prohibiting the disbursement of public funds or the requirement of services until such time as the contract is registered in accordance with the applicable laws and regulations. However, these radical changes in the jurisprudential regulations on government contracting do not have the effect of altering the public policy established in our legal system to the effect that the sound administration of a government involves performing its functions as a buyer with the greatest effectiveness to protect the people's interests and money.

18. Statutes, Customs, and Equity—Interpretation and Application of the Law—Specific Statutes—Executive Orders.

Executive orders issued by the Governor may not contravene the applicable laws.

**Synopsis**

Petition for *Certiorari* regarding a Judgment issued by *Carlos López Feliciano, Sixto Hernández Serrano, Olga Birriel Cardona,* and *Roberto Rodríguez Casellas*, judges of the Court of Appeals, confirming the Judgment issued by the Court of First Instance and ordering the defendant to execute a retroactive contract with the plaintiff to cover the legal services provided by the latter during fiscal year 2006–2007. *The judgment entered by the Court of Appeals is hereby reversed.*

*Margarita Mercado Echegaray*, solicitor general; *Amir Cristina Nieves Villegas,* assistant solicitor general; *Miguel A. Rangel Rosas* from the law offices of *Maymi, Rivera & Rotger, PSC; Grace Santana Balado*, counsel for the Department of Transportation and Public Works; *Ivette M. Berríos Hernández*, from the law offices of *Vázquez Graziani & Rodríguez, C.S.P.; Ineabelle Santiago Camacho* and *Beatriz Annexy \*452 Guevara*, attorneys at the law offices of *Reichard & Escalera*, counsels for the petitioner; *Hilda M. Arriaga Correa, Ramiro Rodríguez Peña, and Reynaldo Rodríguez Peña* from the law offices of *Ramiro Rodríguez Ramos*, counsels for the respondent.

Chief Judge Mr. Rivera Pérez issued the opinion of the Court.

On this occasion, we must determine whether a verbal contract between a provider of legal services and the Government can be validated by executing a retroactive contract. We hold that it cannot. Understanding that the contract is null and void, that it cannot be validated retroactively, and that the provider cannot come against the government for the services rendered, we reverse the judgment issued by the Court of Appeals.

**I**

Atty. Ramiro Rodríguez Ramos rendered his services as an attorney to the Department of Transportation and Public Works (DTPW) and the Highways and Transportation Authority (HTA) from 1990 to July 2, 2007. The HTA is a public corporation attached to the DTPW.

On February 18, 2006, Atty. Rodríguez Ramos provided to the director of the Office of Legal Affairs of the DTPW and the HTA, Atty. Manuel Cámara Montull, the documents required to renew his contracts for fiscal year 2006–2007. On May 16, 2006, Special Assistant to the Secretary of the DTPW Atty. Alberto Castro informed Atty. Rodríguez Ramos that the HTA would renew his contract, provided him with the draft contract, and asked him to provide the

documents needed for the renewal once again. Atty. Rodríguez Ramos proceeded to do so.

The HTA prepared the professional services contract for fiscal year 2006–2007 and the certification for its registration **\*453** with the Office of the Comptroller. Attorney Rodríguez Ramos signed both documents and delivered them to Atty. Cámara Montull to be signed by the agency and registered with the Office of the Comptroller. However, Atty. Cámara Montull only registered the draft contract with the Finance Area but did not process it. On December 22, 2006, Atty. Rodríguez Ramos again submitted the necessary documents to renew the contracts in writing. He then informed Atty. Cámara Montull and the legal adviser to the executive director of the HTA, Atty. Ivette Cancel, that they had to pay him for the services provided through a debt acknowledgment resolution, as the HTA and DTPW had authorized him to continue to provide his services.

In June 2007, Atty. Grace Santana Balado took over the management of the Office of Legal Affairs and asked Atty. Rodríguez Ramos for a report on the matters that had been referred to him. Atty. Rodríguez Ramos submitted the requested report and the documents needed to execute the contracts for the following fiscal year 2007–2008. He then informed Atty. Santana that his contract had not been renewed for that year, so he asked her to inform him in writing if he was authorized to continue legally representing the agency in court. On July 2, 2007, Atty. Santana told him that he would not be awarded a contract for the referenced fiscal year and that he would not be paid for the services provided that were not covered by a written contract. Consequently, she asked him to withdraw as legal counsel of the HTA and DTPW in court and hand over the files of the cases that had been assigned to him.

Atty. Rodríguez Ramos then filed the captioned complaint on September 4, 2007. He claimed that the HTA owed him $106,910.16 for services rendered during fiscal years 2004–2005 and 2005–2006, as well as $264,786.70 for **\*454** fiscal year 2006–2007. Moreover, he claimed from the DTPW $11,521.61 for legal services rendered during fiscal year 2004–2005, $2,343.75 for fiscal year 2005–2006, and $46,323.76 for fiscal year 2006–2007. In 2010, the HTA and DTPW paid the sums of money corresponding to the first two periods but not those corresponding to fiscal year 2006–2007. Atty. Rodríguez Ramos filed a motion for summary judgment. He argued that the HTA and DTPW were required to pay him for the remaining services because they had been the ones that prevented the contract from being reduced to writing. For their part, the HTA and DTPW argued that the requirement that

contracts are reduced to writing is indispensable for the birth of the obligation between the service provider and the State. The Court of First Instance determined through partial summary judgment that, once Atty. Rodríguez Ramos signed the contracts with the HTA and the DTPW for fiscal year 2006–2007, the corresponding officers were required to sign and register them with the Office of the Comptroller. It therefore ordered the defendant to execute a retroactive contract with the plaintiff to cover the professional services rendered during fiscal year 2006–2007, register it with the Office of the Comptroller, and pay Atty. Rodríguez Ramos for the services rendered during that period. In sum, the court based its decision on the general doctrine of contracts, on Public Law No. 18 of October 30, 1975, known as the Law for the Registration of Contracts with the Office of the Puerto Rico Comptroller, as amended (Public Law No. 18-1975), 2 LPRA sec. 97(a), and on Executive Order OE-2006-23, *infra*. The primary court maintained its decision following a motion for reconsideration.

Not satisfied, the Commonwealth of Puerto Rico (the "Commonwealth") appeared before the Court of Appeals. Said forum confirmed the decision of the Court of First Instance. Still dissatisfied, **\*455** the Commonwealth appears before us. It argues that the intermediate appellate forum erred in ordering the defendant to enter into a retroactive contract to cover the legal services provided by Atty. Rodríguez Ramos in fiscal year 2006–2007. It holds that "[s]aid mandate contravenes the provisions of Public Law No. 237 of August 31, 2004, the case law [...] regarding government contracts, and the constitutional public policy that mandates the most appropriate and responsible allocation of public funds." Petition for *Certiorari*, at p. 8. We ordered the plaintiff to show cause for which we should not reverse the appealed decision. The plaintiff proceeded to do so. With the benefit of the appearance of both parties, we issue the writ and proceed to rule.

## II

### A. *General Rule Regarding Contracts*

**[1]** Art. 1044 of the Civil Code, 31 LPRA sec. 2994, provides that "obligations arising from contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations." *[Official translation]* See, also: *VDE Corporation v. F & R Contractors*, 180 DPR 21, 34 (2010); *López v. González*, 163 DPR 275, 281 (2004).

Consequently, a contract exists from the moment one or more persons consent to bind themselves, with regard to another or others, to give something or to render some service. *[Official translation]* Art. 1206 of the Civil Code, 31 LPRA sec. 3371. *Unisys v. Ramallo Brothers*, 128 DPR 842, 852 (1991).

The contract will be valid as long as the following requisites concur: consent, object, and cause. Art. 1213 of the Civil Code, 31 LPRA sec. 3391. In fact, Art. 1230 of the same Code, 31 LPRA sec. 3451, clearly establishes that "[c]ontracts shall be binding, whatever may be the form in which they may have been executed, provided the essential conditions required for their validity exist." *[Official translation]*

**[2]** In our legal system, the principle of contractual **\*456** autonomy allows the contracting parties to establish the agreements, clauses, and conditions that they may deem convenient. Art. 1207 of the Civil Code, 31 LPRA sec. 3372. See: *Torres, Torres v. Torres et al.*, 179 DPR 481, 493 (2010); *Oriental Financial v. Nieves*, 172 DPR 462, 470–471 (2007). However, the contract will be null and nonexistent if it is in contravention of the law, morals, or public order. *Pepsi-Cola v. Mun. Cidra et al.*, 186 DPR 713, 752 (2012); *Oriental Financial v. Nieves*, supra; *Morales v. Municipio de Toa Baja*, 119 DPR 682, 692–693 (1987). This is regardless of the type of contract and its importance to the contracting parties. *De Jesús González v. A.C.*, 148 DPR 255, 263–264 (1999). See, also, *Morales v. Municipio de Toa Baja*, supra. In such cases, any of the contracting parties may challenge the contract, even if they have benefitted from it. *De Jesús González v. A.C.*, supra, at p. 264; *Rasa Eng.Corp. v. Daubón*, 86 DPR 193, 198 (1962).

### B. *Government Contracting*

**[3]** Regarding government contracting, the State is bound, by constitutional decree, to manage public funds in keeping with the highest fiduciary and ethical principles. *Jaap Corp. v. Depto. Estado et al.*, 187 DPR 730, 739 (2013); *C.F.S.E. v. Unión de Médicos*, 170 DPR 443, 452 (2007). In particular, Sec. 9 of Art. VI of our Constitution establishes that "[p]ublic assets and funds shall only be used for public purposes and for the maintenance and functioning of the institutions of the State, and always by authority of law." Art. VI, Sec. 9, Const. Commonwealth, LPRA, Volume 1, ed. 2008, at p. 429.

To comply with this constitutional mandate, the Legislature has enacted laws that impose fiscal and government contracting controls. *Jaap Corp. v. Depto. Estado et al.*, supra. Thus, in accordance with the above-cited provisions of the Civil Code, a contract between a private **\*457** party and the State that does not comply with said laws shall be null and nonexistent. Art. 1207 of the Civil Code, *supra*. With this in mind, let us see the legal provisions that apply to the contract before us.

*C. Puerto Rico Government Accounting Act*

**[4]** Public Law No. 230 of July 23, 1974, as amended, known as the Puerto Rico Government Accounting Act, 3 LPRA sec. 283 *et seq.* (Public Law No. 230-1974), was enacted with the objective of achieving "*previous* control of all government operations" so that it is possible to plan the corresponding government budget and programs. (Emphasis added.) Art. 2(e) of Public Law No. 230-1974 (3 LPRA sec. 283a(e)). To this end, said law establishes that "[a]ll appropriations and funds authorized for the expenditures of a fiscal year shall be applied *exclusively* to the payment of expenses *lawfully incurred* during the respective year or to the payment of obligations *legally contracted and duly entered in the books of said year.*" *[Official translation]* Art. 8(a) of Public Law No. 230-1974 (3 LPRA sec. 283g(a)). It should be noted that Art. 3(k) of said law, 3 LPRA sec. 283b(k) defines "obligation" as "[a] given pledge which is represented by a purchase order, *contract or similar document,* pending payment, *signed by competent authority to encumber the appropriations, and which in the future may be converted into a demandable account. [Official translation]* (Emphasis added.)

**[5–6]** Likewise, Art. 9(a) of the same body of law, 3 LPRA sec. 283h(a), mandates that:

> [t]he dependencies shall order obligations and disbursements from their public funds *only* to pledge or pay for services, supplies, materials and equipment, and claims or other items *authorized by law.* The Secretary shall record the obligations and make and record the disbursements according to the *documents* submitted by the dependencies, which shall be *previously approved as an obligation or for payment* by the corresponding head of the dependency or by **\*458** the official or employee the latter may designate as his/her authorized agent. *[Official translation]* (Emphasis added.)

Thus, Public Law No. 230-1974 clearly states that for a contract executed by the State and a private party to be valid and enforceable, it must be in writing prior to the corresponding considerations.

*D. Law to Establish Uniform Parameters in the Processes for Contracting Professional or Consulting Services for Government Agencies and Entities*

**[7]** As regards the case under consideration, the Legislative Assembly enacted Public Law No. 237 of August 31, 2004, known as the Law to Establish Uniform Parameters in the Processes for Contracting Professional or Consulting Services for Government Agencies and Entities, as amended, 3 LPRA secs. 8611–8615 (Public Law No. 237-2004). For a government contract for the provision of professional or consulting services to be valid, it must comply with the requirements of this law. Id. Legal services are covered by said law's definition of the concept "professional or consulting services," namely those "whose primary purpose consists in providing intellectual, creative, or artistic products or in the management of highly technical or specialized skills." *[Official translation]* Art. 1 of Public Law No. 237-2004 (3 LPRA sec. 8611).

**[8]** Firstly, Art. 2 of Public Law No. 237-2004 (3 LPRA sec. (8612) clearly establishes that government contracts for professional or consulting services shall be especially perfected and used solely when the government entity lacks or is unable to use the internal resources to be contracted, or when the *expertise,* skills, or experience of the contractor are needed to achieve the purposes for which the same is contracted. *[Official translation]* Said article also requires that, when retaining the services of a contractor, the State take into account "the real need **\*459** for the services to be contracted as well as the financial situation and the budget of the contracting government entity." Id.

**[9]** In addition to establishing that government contracting of professional services must be exceptional, Public Law No. 237-2004 lists in its Art. 3 a number of requirements, both formal and substantive, that any contract between the State and a contractor must fulfill. 3 LPRA sec. 8613. Specifically, said article requires that:

> (a) "The execution of a professional or consulting services contract between a contractor and the Government be *prospective.* The government entities shall pay solely for the services rendered.
> (b) The legal provision that authorizes the government entity to grant contracts shall be formalized in writing and included in the text of the contract." *[Official translation]* (Emphasis added.) Id.

The rest of the paragraphs of this legal provision detail the information that the contract must contain about the contractor, the services that the contractor will provide, the duration of the contract, the maximum amount to be paid, and the method of payment. Id. Then, Art. 5 of the same law, 3 LPRA sec. 8615, requires the inclusion in the contract of an extensive list of mandatory clauses.

**[10]** We thus see that Public Law No. 237-2004 provides that any government contract for professional or consulting services, which category includes the provision of legal

services, is valid only if it is reduced to writing and has prospective effect. Without a doubt, Public Law No. 237-2004 prohibits the verbal and retroactive contracting of professional and consulting services.

*E. Case Authority on Government Contracts*

**[11]** For our part, we have reiterated that for a contract between a private entity and the State to have **\*460** binding effect between the parties, it must be in writing. *Cordero Vélez v. Mun. de Guánica*, 170 DPR 237, 248 (2007); *Municipio Mayagüez v. Lebrón*, 167 DPR 713, 719–720 (2006). This requirement has to be met "*without exception.*" (Emphasis in original.) *Fernández & Gutiérrez v. Mun. San Juan*, 147 DPR 824, 833 (1999), citing *Hatton v. Mun. de Ponce*, 134 DPR 1001 (1994).

**[12]** In fact, in *ALCO Corp. v. Mun. De Toa Alta*, 183 DPR 530 (2011), we faced a controversy where a contractor began to perform his services without yet obtaining a written contract, finished his work, and the parties subsequently executed the written contract. Id. Once the contractor tried to collect what he was owed from the municipality, he appeared, unsuccessfully, before the court. Id. When the case was brought to our consideration, we strongly rejected the validation of municipal verbal contracts through the execution in writing of retroactive formal contracts. Id., at p. 540. We concluded that performing a work before having a written contract violates the rules of government contracting. Id. In addition, we reasoned that retroactively validating a contract would encourage corruption, as a contractor could perform the work before executing the written contract to press for its future execution whether by the current administration or the next. Id., at p. 543.

**[13]** We also recently ruled that retroactive contracting relating to the leasing of property violates the rules and regulations regarding government contracts. *Jaap Corp. v. Depto. Estado et al.*, supra. In said case, we held that [...] retroactive government contracting renders inoperative any *control previous* to the creation of a government obligation, which is contrary to the public policy established in Art. 2(e) of Public Law No. 230, *supra*. This practice also prevents third parties such as the Office of the Comptroller from complying with the public policy of the Puerto Rico Government Accounting Act and citizens **\*461** from obtaining the written contract to pass judgment on the contracting, for the contract is written and published after the execution and consummation of the obligations stipulated therein. (Emphasis in original.) Id., at p. 748.

**[14]** Thus, we have reiterated that the parties that contract with a government entity without fulfilling the requirements for government contracting risk having to assume responsibility for their losses. *Quest Diagnostics v. Mun. San Juan*, 175 DPR 994, 1002 (2009); *Colón Colón v. Mun. de Arecibo*, 170 DPR 718, 728–729 (2007). This is because we have consequently rejected the application of any equitable relief, such as unjust enrichment, to validate a public obligation without a written contract and thus indemnify the damages suffered by a private party because of its failure to comply with said requirements. *ALCO Corp. v. Mun. de Toa Alta*, supra, at 552; *Las Marías v. Municipio San Juan*, 159 DPR 868, 875 (2003).

*F. Registration with the Office of the Comptroller*

**[15]** In addition to the clear requirement that the government contract be written and prospective, Art. 1 of Public Law No. 18-1975 (2 LPRA sec. 97(a)) provides, in this regard, as follows:

Government and municipal entities of the Commonwealth of Puerto Rico, with no exception whatsoever, shall keep a registry of all contracts executed, including amendments thereto, and shall remit a copy thereof to the Office of the Comptroller within fifteen (15) days following the date of the execution or amendment of the contract. *[Official translation]*

**[16]** In interpreting this provision, we summarize that sound public administration requires that contracts with the Government meet the following requirements: (1) that they be reduced to writing; (2) that a faithful record be kept to establish their *prima facie* existence; (3) that a copy be sent to the Office of the Controller as further **\*462** evidence of its execution, terms, and existence, and (4) that they state the exact time of their execution, that is, that it be shown that they were made and executed fifteen days before. *CMI Hospital v. Depto. Salud*, 171 DPR 313, 320 (2007); *Ocasio v. Alcalde Mun. de Maunabo*, 121 DPR 37, 54 (1988).

Furthermore, we have stated that it is evident that, through this piece of legislation, the lawmaker intends to create a mechanism for checking and publicizing government contracts. *CMI Hospital v. Depto. Salud*, supra; *Fernández & Gutiérrez v. Mun. San Juan*, supra, at p. 830. These stringent provisions are in the interest of the State to prevent waste, corruption, and cronyism in government contracts and thus promote a sound and fair public administration. Id.

**[17]** Subsequently, Public Law No. 127-2004 amended Art. 1 of Law No. 18-1975 to clarify that the failure to comply with

the requirement to register and remit a contract to the Office of the Comptroller can be remedied and does not result in the annulment of the contract. *Colón Colón v. Mun. de Arecibo*, supra, at p. 727–729; *Lugo v. Municipio Guayama*, 163 DPR 208, 219 (2004). Instead, it was provided that the failure to comply with this requirement has the effect of prohibiting the disbursement of public funds or the requirement of services until such time as the contract is registered in accordance with the applicable laws and regulations. Id.

However, we have reiterated that these radical changes in the jurisprudential regulations on government contracting "*do not have the effect of altering the public policy established in our legal system to the effect that the sound administration of a government involves performing its functions as a buyer with the greatest effectiveness to protect the people's interests and money.*" (Emphasis in original.) *Lugo v. Municipio Guayama*, supra, at p. 219. See also, *Colón Colón v. Mun. de Arecibo*, supra. In particular, we clarify that **\*463**

> [...] Public Law No. 127 amended Public Law No. 18 to establish that the failure to remit a copy of a municipal contract to the Office of the Comptroller or the failure to register the same in the books of the municipality does not render the executed contract null and void. *This does not mean*, as the intermediate appellate forum concludes, *that the same principle applies to an agreement that was never reduced to writing. We believe that Public Law No. 127 did not contemplate this scenario.*

There is a marked difference between these requirements. The requirement that a signed contract be recorded in the municipal logbook and its copy be remitted to the Office of the Comptroller is aimed at publicizing municipal contracts to third parties. In this way, third parties can oversee them. However, *demanding that contracts be reduced to writing has an unavoidable dimension of sound public administration*, as it allows for the safeguarding of the interests of the contracting parties in the event of non-compliance, allows for the orderly use of municipal funds, prevents uncertainty in the preparation of the municipal budget, and makes it possible to properly identify the item against which public disbursements will be made in compliance with the law. That is, the former are mostly procedural in nature and can be processed in an orderly manner, but the latter is substantive because of its direct relationship with sound public administration. Accordingly, we must conclude that the *failure to comply with the requirement that municipal contracts be reduced to writing forcibly has an adverse impact on the effectiveness of the obligations undertaken.* (Emphasis added.) *Colón Colón v. Mun. de Arecibo*, supra, at pp. 729– 730.

## G. Executive Order

The lower courts also based their decision on Executive Order OE-2006-23, *infra*, to order the State to execute a retroactive contract with the plaintiff to cover the professional services rendered during fiscal year 2006– 2007, register it with the Office of the Comptroller, and pay Atty. Rodríguez Ramos for the services rendered. Let us examine the applicable rules on executive orders.

**[18]** First, it should be noted that the Governor's power to issue Executive Orders is not **\*464** regulated, justified, or explained by some statutory or constitutional provision. W. Vázquez Irizarry, *Los poderes del gobernador de Puerto Rico y el uso de órdenes ejecutivas*, 76 Rev. Jur. UPR 951, 1020 (2007). For our part, we have been clear in reiterating that executive orders issued by the Governor cannot contravene the applicable laws. See *Otero de Ramos v. Srio. de Hacienda*, 156 DPR 876, 892 (2002), citing *Soto v. Adm. Inst. Juveniles*, 148 DPR 810 (1999).

In this regard, Prof. William Vázquez Irizarry asserts that the classic case in which the use of this mechanism undermines the legislative function is when "the executive order seeks to achieve objectives that have been manifestly rejected by the legislature, in which case the only legal basis that could support the Governor's aspiration is his constitutional powers or a claim of inherent powers." Vázquez Irizarry, *supra*, at p. 1047. It is worth noting that Sec. 4 of Art. IV of our Constitution does not confer on the Governor the power to regulate government contracting with private entities. See Art. IV, Sec. 4, Const. Commonwealth., LPRA, Volume 1.

An executive order could also undermine the process of administrative regulation. Vázquez Irizarry, *supra*, at p. 1051. This type of regulation is a classic function of the administrative forums when the Legislature has delegated to them authority to regulate, in which case the procedural terms provided in the Uniform Administrative Procedure Act of the Commonwealth of Puerto Rico (LPAU, Spanish acronym), Public Law No. 170 of August 12, 1988 (3 LPRA secs. 2101–2201) would apply. Id. In this context, the use of executive orders could pose problems if said orders seek to establish rules that affect the rights of third parties without having the legitimacy of the requirements of citizen participation established by the LPAU. Id., at p. 1053. Professor Vázquez Irizarry asserts the following: **\*465**

> It can be argued that this problem should not exist since one of the principles that define the use of executive orders is that they are mandates that apply "within the executive branch," meaning that no third parties are affected. The truth, however, is that some orders seek to

establish programs or public policies with a level of detail that is close to affecting the citizenry. *This is the case of orders that, although directed at public entities, affect said entities' relationships with third parties, particulary in the area of the acquisition of goods or services.* (Emphasis added.) Id., at p. 1054.

In the captioned case, the lower courts based their respective decisions on the "Executive Order of the Governor of the Commonwealth to Regulate Payment for Services Rendered to Agencies and Instrumentalities of the Executive Branch Without a Formal Contract Duly Registered with the Office of the Comptroller," Executive Order OE-2006-23 (Executive Order) signed by then-Governor Aníbal Acevedo Vilá on June 22, 2006. Specifically, they based their decisions on the statement of purpose of the Executive Order, which states that "[t]he mere fact that a service was provided in accordance with a verbal understanding between the Commonwealth and the contractor does not prevent the Commonwealth from subsequently deciding to reduce said agreement to writing and honor the fair payment for the services provided." Executive Order, at p. 3.

As we have seen, although the Governor has the power to issue executive orders as part of the powers conferred on him by the laws or the powers of his office, he may not issue executive orders contrary to the provisions of the law. *Otero de Ramos v. Srio. de Hacienda*, supra. Public Law No. 237-2004 requires that all government contracts for legal services be made in writing and with prospective effect. That is, said law prohibits the verbal contracting of said services, as well as written contracting with retroactive effect. Similarly, Public Law No. 230-1974 requires that government contracts be previously in writing to be **\*466** valid. Likewise, the requirement that the contract be registered with the Office of the Controller established by Public Law No. 18-1975 entails that it be in writing and prospective.

On the other hand, the Legislative Assembly has not delegated to any administrative agency the power to regulate new government contracting rules that go against the legal provisions discussed in the previous paragraphs. Consequently, the Executive Order is invalid insofar as it allows for the validation of verbal contracts with the State through retroactive formal contracts, contrary to the provisions of the law.

### III

In the captioned case, the fact that the parties never executed a written contract for fiscal year 2006–2007 is not at issue. As we stated above, the cited laws, as well as their interpretative case law, prohibit the disbursement of public funds for services rendered without a valid government contract that meets all of the strict government contracting requirements. They even provide that any contract not executed in accordance with said rules is null and void. We also saw that the Executive Order that would allow for the retroactive validation of the contract in question is invalid because it contravenes the laws on government contracts.

Finally, we have consistently rejected the application of any equitable remedy to validate the verbal public obligation and be able to compensate the private party for the damages suffered by providing services without complying with the rules of government contracting. See: *ALCO Corp. v. Mun. de Toa Alta*, supra; *Las Marías v. Municipio San Juan*, supra.

In applying this normative framework to the case before us, we must conclude that **\*467** Atty. Rodríguez Ramos's claim is not enforceable. He provided his legal services knowing that there was no written contract binding the State. Thus, the verbal contract on which he intends to base his claim is null and void. In view of this reality, it is not appropriate to apply any remedy in equity. Atty. Rodríguez Ramos risked assuming responsibility for his losses, as we have warned anyone who contracts with any government entity without meeting the requirements of government contracting. See: *Quest Diagnostics v. Mun. San Juan*, supra; *Colón Colón v. Mun. de Arecibo*, supra.

Therefore, the lower courts erred in ordering the DTPW and HTA to execute a retroactive contract to cover the professional services rendered during fiscal year 2006–2007, register said contract with the Office of the Comptroller, and pay Atty. Rodríguez Ramos for the services he rendered during said period.

### IV

On the grounds stated hereinabove, *the judgment entered by the Court of Appeals is hereby reversed. Judgment will be entered accordingly.*

Associate Judge Ms. Pabón Charneco issued a concurring vote, to which Associate Judge Mr. Rivera García subscribed. Associate Judge Ms. Rodríguez Rodríguez did not intervene.

Footnotes

1    This is all the more concerning in view of the outcome of the General Elections held on 2 November 2004, which
     resulted in a shared government between the two main political parties in Puerto Rico.

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S.
                                                            Government Works.

**CERTIFICATE OF TRANSLATION**
**SPANISH TO ENGLISH**

**DOCUMENT:** Ramiro Rodríguez Ramos, et al., respondents, v. Commonwealth of PR, et al., petitioners. *Number:* CC-2013-234,

*Resolved:* March 6, 2014  (original Spanish document consisting of 9 pages)

The undersigned, Margot A. Acevedo Chabert, USCCI, hereby certifies that she has been actively engaged as a professional translator and interpreter (English <> Spanish) certified by the Administrative Office of the United States Courts since 2006 (Certificate No. 06-001), that she has an MA in Translation from the University of Puerto Rico, and that to the best of her knowledge and understanding, the attached document is a true and correct translation of the original text provided for translation.

In Milwaukee, WI, on November 30, 2023

**Margot A. Acevedo Chabert, USCCI**

**CM/ECF CERTIFICATE OF FILING AND SERVICE**

I HEREBY CERTIFY: that today December 12, 2023, a true copy of this addendum has been electronically served by the Notice of Docketing Activity to all attorneys of record, in compliance with the Rules of the Federal Rules of Appellate Procedure and the Rules of the Administrative Order Regarding Case Management/Electronic Case Files System ("CM/ECF") of the US Court of Appeals for the First Circuit.

In Guaynabo, Puerto Rico this 12th day of December, 2022.


*s/ Eliezer A. Aldarondo-López*
ELIEZER A. ALDARONDO-LÓPEZ